[No. B034948. Second Dist., Div. Two. June 7, 1989.]

FRIENDS OF THE LIBRARY OF MONTEREY PARK et al., Plaintiffs and Respondents, v.
CITY OF MONTEREY PARK et al., Defendants and Appellants.

360

COUNSEL

Brown, Winfield & Canzoneri and Thomas D. Green for Defendants and Appellants.

Stewart Kwoh, J. Craig Fong, O'Melveny & Myers, John F. Daum, Bruce G. Iwasaki and Peter B. Ackerman for Plaintiffs and Respondents.

Joseph R. Symkowick, Taylor S. Carey, Jan Greenberg Levine and Mary D. Nichols as Amici Curiae on behalf of Plaintiffs and Respondents.

## OPINION

**FUKUTO, J.—**

### Introduction

For nearly 60 years, the City of Monterey Park operated its public library, the Bruggemeyer Memorial Library of Monterey Park, in compliance with the Municipal Libraries Act (Ed. Code, § 18900 et seq.). By city ordinance enacted on October 12, 1987, the city ceased to do so. Respondents, a nonprofit corporation, and three incumbent members of the board of library trustees whose offices were eliminated by the ordinance, filed a petition for writ of mandate in the Los Angeles County Superior Court, challenging the legality of the Monterey Park City Council's action. On May 17, 1988, the superior court granted the petition, and ordered the City of Monterey Park to rescind the challenged ordinance and resume operation of the library in compliance with the Municipal Libraries Act. The superior court further ordered reinstatement of the incumbent members of the board of library trustees. This appeal by the City of Monterey Park followed.

### The Facts

The facts are essentially undisputed. By ordinance enacted February 21, 1929 (City of Monterey Park Ord. No. 210), the City of Monterey Park established a municipal public library (hereinafter, the Bruggemeyer Library). The library was created "under and pursuant to the provisions of that certain Act of the Legislature of the State of California entitled 'An act to provide for the establishment and maintenance of public libraries within municipalities', dated March 23, 1901 and all Acts amendatory and supplementary thereto [hereinafter collectively referred to as the Municipal Libraries Act] . . . ." In compliance with the Municipal Libraries Act, the ordinance provided for management of the library by a board of library trustees consisting of five members, to be appointed by the mayor with the consent of the city council; trustees were to hold office for three-year terms. As required by statute, the library trustees were generally empowered to: make and enforce all rules and regulations necessary for the administration and protection of the library; administer any trust created for the library, and receive and dispose of for the benefit of the library any gift, devise or bequest; prescribe the duties and powers of, and fix the compensation of the librarian and other officers and employees of the library; purchase the necessary books, journals, publications and other personal property; and acquire, furnish and equip a library building as necessary for its effective

operation. (See, Stats. 1901 ch. 170, § 5, pp. 558-559; see also Ed. Code, § 18900 et seq.)[1]

The 1901 Municipal Libraries Act contained a provision which mandated that the legislative body of any municipality establishing a public library in accordance with the act, "shall . . . if the maintenance of the library has not been otherwise provided for, levy a tax for the purpose of maintaining such library and purchasing property necessary therefor, which tax shall be in addition to other taxes, the levy of which is permitted in the municipality . . . ." (Stats. 1901, ch. 170, § 7, p. 559.) From its inception in 1929, through fiscal year 1977-1978, the Bruggemeyer Library was funded by such a tax. Since that time, the library has been primarily supported from the city's general funds.

On October 12, 1987, the Monterey Park City Council adopted an ordinance disbanding the incumbent board of library trustees and transferring control of the library to the Monterey Park City Council. (City of Monterey Park Ord. No. 1726.) The ordinance established a five-member library commission to act in an advisory capacity to the city council in all matters pertaining to the library.

Monterey Park is, and at all times relevant to this appeal has been, a municipal corporation organized under the general laws. (Gov. Code, § 34102.)

At the hearing of respondents' petition for writ of mandate, the superior court made the following findings: (1) that the Municipal Libraries Act (Ed. Code, § 18900 et seq.) governs the establishment and management of public libraries in California general law cities; (2) that Education Code section 18910 requires that the Bruggemeyer Library be managed by a board of library trustees; (3) that Monterey Park Ordinance No. 1726 is in conflict with the Municipal Libraries Act; and (4) that Government Code section 39732 does not provide general law cities with separate, independent authority to establish and manage public libraries outside the rubric of the Municipal Libraries Act. The trial court issued a writ of mandate ordering appellants to rescind the challenged ordinance and reinstate the incumbent board of library trustees. The trial court further directed that the terms of incumbent board members be extended by seven months to compensate for the seven-month period during which such terms were interrupted by adoption of Ordinance No. 1726.

---

[1] The 1901 act has been repeatedly amended, most recently in 1976. As amended, the Municipal Libraries Act retains provisions assigning management and control of such libraries to a five-member board of library trustees whose members hold office for terms of three years. (Ed. Code, §§ 18900-18965, as amended by Stats. 1976, ch. 1010, pp. 2882-2885.)

## The Issues

Government Code section 39732 provides that the legislative body of a city may "(a) Acquire, own, construct, maintain, and operate bus lines, street railways, steam railway spur tracks, telephone and telegraph lines, gas and other works for light, power, and heat, public libraries, museums, gymnasiums, parks and baths." ■ We are asked to decide whether this section furnishes independent statutory authority, apart from the Municipal Libraries Act, for the establishment and operation of public libraries by general law cities (Gov. Code, § 34102). If such authority is conferred, then the trial court erred in issuing its writ of mandate, compelling appellants to resume operation of the Bruggemeyer Library in compliance with those provisions of the Education Code known as the Municipal Libraries Act.

■ We are also asked to determine whether the trial court abused its discretion and violated the provisions of the Municipal Libraries Act by extending the terms of incumbent trustees for a period equal to the amount of time such trustees were deprived of their offices by appellants' actions.

## Discussion

The two statutory schemes under discussion are found in two entirely different codes, and neither makes reference to the provisions of the other. As Government Code section 39732 is arguably susceptible of the construction advanced by appellants, we examine the historical and legislative background of each statutory scheme to divine the Legislature's intent regarding the governance of municipal libraries. (*California Mfrs. Assn.* v. *Public Utilities Com.* (1979) 24 Cal.3d 836, 844 [157 Cal.Rptr. 676, 598 P.2d 836].)

### The Municipal Libraries Act

The first general public library legislation in California was the 1878 "Act to establish and maintain free public libraries and reading-rooms." (Stats. 1878, ch. 266, §§ 1-8, pp. 329-331.) Enacted at a time corresponding to the growth of compulsory education as an important political issue (Steig, *Notes on the Origins of Public Libraries in California, 1850-1900* (1951) 21 Library Q. 265), the law authorized the City and County of San Francisco, and "the municipal authorities of the several incorporated cities and towns of this State" to levy and collect an annual tax for the purpose of establishing free public libraries and reading rooms. (Stats. 1878, ch. 266, § 1, p. 329.) Like its successor statutes, the 1878 act provided, inter alia, for the appointment of trustees by the municipal authorities to "make, such rules and regulations, and by-laws, as may be necessary for the government and protection of such libraries and reading rooms, and all property belonging thereto, or

that may be loaned, devised, bequeathed, or donated to the same." (Stats. 1878, ch. 266, § 2, p. 329.)

The 1878 act was repealed and substantially reenacted in the 1880 "Act to establish free public libraries and reading rooms." (Stats. 1880, ch. 126, §§ 1-15, pp. 231-233.) The 1880 act retained provisions authorizing the levy of a special tax for the purpose of establishing and maintaining public libraries, and providing for management of such libraries by trustees. Trustees were either appointed or elected, however, depending upon whether the population of the city was more or less than 100,000.

The 1901 Municipal Libraries Act, under which the Bruggemeyer Library was created, also included provisions authorizing the levy of a special tax for the purpose of maintaining municipal libraries. (Stats. 1901, ch. 170, § 7, p. 559.) In other respects, the 1901 act differed substantially from its predecessors. Among the most notable differences, the 1901 act provided that the governing body of any incorporated city or town "may, and upon being requested to do so by one fourth of the electors of such municipal corporation . . . *must,* by ordinance, establish in and for said municipality a public library; *provided* there be none already established therein." (Stats. 1901, ch. 170, § 1, p. 557, italics added.) Like the current Municipal Libraries Act, the 1901 act contained provisions mandating governance of the library by a board of library trustees whose members held office for three-year terms. (Stats. 1901, ch. 170, §§ 3-6, pp. 558-559.) Trustees were *appointed* by the "mayor, president of the board of trustees or other executive head of the municipality, with the consent of the legislative body of said municipality" regardless of city population. (Stats. 1901, ch. 170, § 3, p. 558.)

The 1901 act declared: "Every library established under this act shall be forever free to the inhabitants and non-resident taxpayers of the municipality, subject always to such rules, regulations and by-laws as may be made by boards of library trustees; *and provided,* that for violations of the same a person may be fined or excluded from the privileges of the library." (Stats. 1901, ch. 170, § 9, p. 559, original italics.) Another provision authorized the *disestablishment* of libraries created under the act. It stated, "Any ordinance establishing a library adopted under the provisions of section one of this act may be repealed by the body which adopted the same upon being requested to do so by one fourth of the electors of such municipal corporations, in the manner provided in section two of this act, and upon the repeal of such ordinance such library shall be disestablished in such municipal corporation." (*Id.* at § 13, p. 560.)[2] Also included in the 1901 act was a

---

[2] Section 2 of the act provided that requests to establish public libraries must be made by a petition or substantially similar petitions signed by the requisite number of electors.

provision stating that "this act shall have no application to any library established or governed by the provisions of a city charter, and the provisions of any city charter shall in no manner be affected by this act." (*Id.* at § 12, p. 560.)

The 1901 Municipal Libraries Act was amended by the Legislature in 1909. (Stats. 1909, ch. 481, §§ 1-2, pp. 823-824.) The 1909 legislation increased the maximum annual special tax which could be levied for the support of a municipal library, made insignificant changes in provisions governing disbursement of library revenues, and increased to 51 percent the percentage of electors' signatures necessary to authorize disestablishment of libraries organized under the act. (Stats. 1909, ch. 481, § 1, p. 823.)

In 1943, comprehensive legislation was enacted creating the Education Code. (Stats. 1943, ch. 71.) The 1901 Municipal Libraries Act was incorporated into the Education Code, substantially unchanged. (Former Ed. Code, §§ 22201-22265.) The Education Code was repealed and reenacted for the sole purpose of rearranging its provisions in a more logical sequence in 1959. (Stats. 1959, ch. 2, § 1, p. 595.) The 1959 legislation renumbered but did not make any substantive changes in the 1901 act. (Former Ed. Code, § 27301 et seq.) Additional, nonsubstantive amendments to provisions of the Municipal Libraries Act were made in 1971 and 1976. (Stats. 1971, ch. 438, § 83, p. 880; Stats. 1976, ch. 1010, pp. 2882-2885.) The current numbering of the act (Ed. Code, § 18900 et seq.) is a product of 1976 legislation reorganizing the Education Code. (Stats. 1976, ch. 1010.)

Pursuant to the 1976 revision of the Education Code, the special tax provision of the Municipal Libraries Act was codified in Education Code section 18950.[3] That section was repealed by urgency legislation, effective July 8, 1977 (Stats. 1977, ch. 309, § 1, p. 1233), because such special tax provisions had been superseded to a large extent by general property tax limitations. (Legis. Counsel's Dig., Assem. Bill No. 99, Stats. 1977 (1977-1978 Reg. Sess.) Summary Dig., p. 74.)

### Government Code Section 39732

The historical roots of Government Code section 39732 date back to the California Constitution of 1879. The framers of the 1879 Constitution

---

[3] Former Education Code section 18950 provided: "The legislative body of any municipality in which a public library is established pursuant to this chapter, shall in making the annual tax levy and as part thereof, if the construction and maintenance of the library has not been otherwise provided for, levy a tax for the purpose of construction and maintaining the library and purchasing property necessary therefor. The tax shall be in addition to other taxes, the levy of which is permitted in the municipality. The tax levy shall not exceed thirty cents ($0.30) per one hundred dollars ($100) of assessed valuation. As used in this section, maintenance includes preserving, repairing and altering existing structures."

adopted a plethora of provisions providing for the organization and incorporation of cities and vesting in cities extensive powers of local self-government. (Peppin, *Municipal Home Rule in California: I* (1941) 30 Cal.L.Rev. 1, 38.) Among these provisions was article XI, section 6, which survives in substance today. Originally the section provided: " 'Corporations for municipal purposes shall not be created by special laws; but the Legislature, by general laws, shall provide for the incorporation, organization, and classification, in proportion to population, of cities and towns, which laws may be altered, amended, or repealed. Cities and towns heretofore organized or incorporated may become organized under such general laws whenever a majority of the electors voting at a general election shall so determine, and shall organize in conformity therewith; and cities and towns heretofore or hereafter organized, and all charters thereof framed or adopted by authority of this Constitution, shall be subject to and controlled by general laws.' " (See Historical Note, 2 West's Ann.Cal.Const. (1954 ed.) art. XI, § 6, pp. 525-526.)

Also included in the 1879 Constitution was a provision (former art. XI, § 8) giving any city having a population of 100,000 or more (amended in 1890 to give any city having a population of 3,500 or more) the power to frame a "freeholders charter" for its own government. (*Municipal Home Rule, supra,* at p. 38; see Historical Note, 2 West's Ann.Cal.Const. (1954 ed.) art. XI, § 8, p. 595.)[4] In 1879, San Francisco was the only California city having a population of 100,000 or more, and no other California city appeared likely to reach such a population for many years. (Peppin, *Municipal Home Rule in California: II: Prohibition of Special Legislation and Provision for Incorporation Under General Laws* (1941) 30 Cal.L.Rev. 272, 275, Appen. D (hereinafter referred to as Peppin II.).)

In summary, the 1879 Constitution established for preexisting California cities three possible options for organization: (1) to retain and continue to operate under a pre-1879 charter; (2) to reorganize under general laws to be promulgated by the Legislature in accordance with article XI, section 6; or (3) upon attaining a population of 100,000, to frame a new freeholders charter. (Peppin II, at p. 275.)

■ Under the mandate of the 1879 Constitution, in 1883 the Legislature enacted comprehensive legislation "to provide for the organization, incorporation, and government of municipal corporations." (Stats. 1883, ch. 49; former Pol. Code, §§ 1-886, hereinafter "Municipal Corporations Bill.")

---

[4]Former article XI, section 8 was repealed in 1970. (See Historical Note, 2 West's Ann. Const. (1989 Supp.) art. XI, § 8, p. 150.) Authority for the creation of charter cities survives today in article XI, section 3 of the California Constitution and Government Code section 34450.

The Municipal Corporations Bill divided municipal corporations into six classes according to population, and prescribed a different "charter" for each class of municipal corporation. The bill also established procedures for the incorporation of new cities and reorganization and incorporation under the bill of preexisting cities. Incorporation required adoption of the charter prescribed for the class to which the city belonged, according to population, by vote of a majority of electors. With limited exceptions not relevant to this discussion, once a city incorporated under the bill, it retained the charter prescribed for it as of that date, notwithstanding any subsequent change in population. (Stats. 1883, ch. 49, §§ 1-8, pp. 93-99; see also Peppin II, at p. 295.)[5]

The earliest statutory predecessor to Government Code section 39732 is found in section 64 of the 1883 Municipal Corporations Bill. (Stats. 1883, ch. 49, § 64, p. 119.) Section 64 specifically empowered the governing bodies of municipal corporations of the first class, comprised of cities having a population of more than 100,000 to "establish, maintain, and regulate free public libraries and reading rooms, and to perpetuate such free libraries and reading rooms as may have been heretofore established in such cities, or cities and counties, heretofore incorporated." (Stats. 1883, ch. 49, § 64, p. 119.)[6] Similar powers were not given to the governing bodies of smaller cities.

In 1891, the Municipal Corporations Bill was amended to confer upon the governing bodies of cities of the sixth class (then comprised of cities having a population not exceeding 3,000 at the time of incorporation) various additional powers, including the power to "acquire, own, construct, maintain, and operate street railways, telephone and telegraph lines, gas and other works for light and heat, public libraries, museums, gymnasiums, and baths . . . ." (Stats. 1891, ch. 163, § 1, pp. 234-235.)[7] This provision existed in substantially the same form in 1929, when Monterey Park created its public library. (See Stats. 1925, ch. 54, § 1, p. 126.)

In 1949, the sections of the Political Code which previously codified the Municipal Corporations Bill were substantially revised and replaced in title

[5] Use of the term "charter" in the 1883 Municipal Corporations Bill is somewhat misleading; cities incorporated under its provisions are considered "general law cities." (Peppin II, at p. 318.)

[6] By the 1890 federal census, San Francisco was the largest California city, with a population of 298,997. Los Angeles was the second largest city, with a population of 50,395. (See Peppin II, at p. 327, Appen. D.)

[7] We resist the temptation to speculate why larger cities, except those with populations exceeding 100,000, were not granted similar powers. We note, however, that by the 1890 federal census, there were still only 23 cities with populations less than 100,000 and more than 3,000. (Peppin II, at p. 327, Appen. D.)

4 of the Government Code (Gov. Code, § 34000 et seq.). (Stats. 1949, ch. 79.) The 1949 act reclassified cities, according to the population of each city as shown by the 1920 federal census. (Stats. 1949, ch. 79, § 1, pp. 101-102.) Pursuant to such reclassification, fifth class cities comprised cities having a population of more than 8,000 and not exceeding 20,000, and sixth class cities comprised cities having a population of not exceeding 8,000 *and* any city incorporated subsequent to the 1920 federal census which did not adopt a charter. (Stats. 1949, ch. 79, § 1, p. 102.) Reclassification did not change the classification of previously incorporated cities. (*Ibid.*)

Under the 1949 act, both fifth and sixth class cities were empowered to "[a]cquire, own, construct, maintain, and operate bus lines, street railways, steam railway spur tracks, telephone and telegraph lines, gas and other works for light, power, and heat, public libraries, museums, gymnasiums, parks, and baths." (Former Gov. Code, § 39732, subd. (a); Stats. 1949, ch. 79, § 1, p. 206.)

Classification of municipal corporations by population ceased under revisions to the Government Code enacted in 1955. (Stats. 1955, ch. 624.) The system of classification was supplanted by a simpler system, in use today, classifying cities organized under a charter as "chartered cities" (Gov. Code, § 34101) and cities organized under general law as "general law cities" (Gov. Code, § 34102). (Stats. 1955, ch. 624, § 54, p. 1121.) Government Code section 39732 survived the 1955 revision of the Government Code, and now authorizes the acquisition and operation of public libraries by any municipal legislative body.

## I.

The histories of the Municipal Libraries Act and the Municipal Corporations Bill tell us little more than that the statutory predecessors of each were independently enacted during the late 1800's in response to entirely different legislative concerns. The evolution of the two statutory schemes into their present day forms likewise occurred independently, without common legislative design or purpose.

In its current form, Government Code section 39732 merely lists the various utilities, services, and recreational facilities, including public libraries, that a city may own and operate. By contrast, the provisions of the Education Code relating to city libraries (Ed. Code, § 18900 et seq.) prescribe a detailed scheme for the establishment and operation of such libraries. Moreover, the Municipal Libraries Act is itself only one small part of a larger statutory scheme, which includes provisions, inter alia: establishing a California library services board responsible for implementing a statewide

policy of free and convenient public access to free library services (Ed. Code, §§ 18701-18724); promoting a policy of universal borrowing among local public libraries and reimbursing such libraries participating in a state-wide interlibrary loan program (Ed. Code, §§ 18731, 18765); offering state funding, administrative support, and technical assistance to local public libraries participating in a state-sponsored Families for Literacy Program (Ed. Code, §§ 18735-18735.4); creating a state-maintained computerized data base of bibliographic records and locations of all materials acquired by public libraries in the state (Ed. Code, § 18767); and establishing a state-sponsored, state-funded "foundation program" for the purpose of making available to all residents of the state a minimum level of public library service, regardless of the taxable wealth of the local jurisdiction providing the service (Ed. Code, §§ 18010-18031).

Adding to the already elaborate statutory scheme for the establishment and support of a statewide network of local public libraries, the Legislature recently adopted the California Library Construction and Renovation Bond Act of 1988. (Stats. 1988, ch. 49, § 1.) The measure, which added Education Code sections 19951-19981, was adopted upon approval by electors at the November 8, 1988 General Election. As its title implies, the Library Construction and Renovation Bond Act promulgated a statewide program to encourage the construction and renovation of local public libraries through the use of matching state and local funds.

Codified in Education Code section 19951 is the following statement of legislative intent: "(a) The public library is a supplement to the formal system of free public education, a source of information and inspiration to persons of all ages, cultural backgrounds, and economic statuses, and a resource for continuing education and reeducation beyond the years of formal education, and therefore deserves adequate financial support from government at all levels. [¶] (b) It is in the interest of the people and of the state that there be a general diffusion of information and knowledge through the continued operation of free public libraries. This diffusion is a matter of general concern inasmuch as it is the duty of the state to provide encouragement to the voluntary lifelong learning of the people of the state."

 The trial court's determination that appellants are bound to operate the Bruggemeyer Library in compliance with the detailed regulatory provisions of the Municipal Libraries Act is compatible with legislative history and the manifest policy of this state to supplement the public education system with a statewide network of local public libraries accessible to persons of all ages, cultural backgrounds, and financial means. Such a construction is equally consistent with the general principle of statutory construction that specific statutory provisions relating to a particular sub-

ject will govern, as against a general provision, in matters concerning that subject. (*Bailey* v. *Superior Court* (1977) 19 Cal.3d 970, 977, fn. 8 [140 Cal.Rptr. 669, 568 P.2d 394]; Code Civ. Proc., § 1859.)

A 1978 opinion of the Attorney General lends additional support for the trial court's construction of the statutory scheme. In 61 Ops.Cal.Atty.Gen. 512 (1978), the Attorney General addressed the question of whether a general law city could charge fees of local residents for the use of a public library despite a provision of the Municipal Libraries Act mandating that every library established pursuant to the act "shall be forever free . . . ." (Ed. Code, § 18960.) The Attorney General considered and rejected the argument that a city library could independently operate under Government Code section 39732 and charge such fees.

Having examined the same two statutory schemes under consideration here, the Attorney General concluded that "the detailed provisions of the Education Code prevails [*sic*] over the general provisions of the Government Code to the extent that they may be inconsistent." (61 Ops.Cal.Atty.Gen. at p. 517.) Elaborating upon his conclusions, the Attorney General stated: "Further, because of the marked contrast between the unelaborated designation of city libraries in Government Code section 39732 and the extended and detailed provisions for such libraries in the Education Code, Government Code section 39732 cannot be viewed as an independent alternative source of library-establishing authority for cities but must be viewed merely as a collateral confirmation of the grant of authority more fully delineated in the Education Code. [¶] If it were viewed otherwise, local authorities could completely bypass the Education Code's explicit directives for the establishment and operation of public libraries simply by declaring in some manner that the library was being established under the minimal provisions of the Government Code rather than under the Education Code. It cannot be presumed that the Education Code's elaborately devised legislative plan for the establishment and operation of city public libraries was to have so little authoritative significance. Statutes are not to be interpreted in a manner which affords an opportunity for evasion of its provisions." (*Ibid.*) We concur with the Attorney General's analysis.

Significantly, despite numerous amendments, the Municipal Libraries Act still retains a provision expressly governing disestablishment of city public libraries. Education Code section 18964 provides: "Any ordinance establishing a library adopted pursuant to this chapter shall be repealed by the body which adopted it upon being requested to do so by 51 percent of the electors of the municipal corporation, as shown by the great register. Upon the repeal of the ordinance the library is disestablished in the munici-

pal corporation." Even assuming Government Code section 39732 constituted independent authority for the establishment and operation of municipal public libraries, the disestablishment of the Bruggemeyer Library was never requested by 51 percent of the city's electors, as mandated by Education Code section 18964. On this ground as well, we question the city council's authority to unilaterally abolish a city library organized under the Municipal Libraries Act, and "replace" it with one ostensibly operated under authority of Government Code section 39732. Such actions clearly defeat the Legislature's manifest purpose in requiring approval of the voting public for the disestablishment of any public library created and operated under the Municipal Libraries Act.

## II.

■ Appellants nevertheless contend that, historically, the Municipal Libraries Act was intended to govern only those city libraries funded by a special tax. Since the Bruggemeyer Library is presently supported by general funds rather than a special tax, it is argued that compliance with the detailed regulatory provisions of the Municipal Libraries Act is no longer required, and the public library may be owned, maintained, and operated by the city council pursuant to the broad authority conferred by Government Code section 39732.

The current version of the Municipal Libraries Act does not expressly limit its application to libraries funded by special taxes. The subject of special taxes or library financing is simply not addressed. Nor is there any support for appellants' interpretation of the applicable statutes in earlier versions of the act.

The 1878 Municipal Libraries Act merely authorized the levy of a special tax for the purpose of establishing and maintaining free public libraries and reading rooms. (Stats. 1878, ch. 266, § 1, p. 329.) A special tax provision was also included in the 1901 version of the act, permitting imposition of a special library tax "if the maintenance of the library has not been otherwise provided for . . . ." (Stats. 1901, ch. 170, § 7, p. 559.) Until 1977, when the special tax provision was repealed, all subsequent versions of the act employed similar language, including former Education Code section 18950, which allowed for an annual library tax levy "if the construction and maintenance of the library has not been otherwise provided for . . . ." (Stats. 1976, ch. 1010, § 2, p. 2884.)

At no time in history was the special library tax the exclusive means of funding libraries created under the Municipal Libraries Act. Rather, a special tax was *authorized* if no other adequate source of funding was provided. Viewed in social and historical context, the Legislature's purpose

in allowing cities to impose special library taxes was clearly to encourage and expedite the growth of free public libraries by offering alternatives to philanthropy for their creation and support. (See Steig, *Notes on the Origins of Public Libraries in California, 1850-1900* (1952) 22 Library Q. 263-267.) It does not logically follow that the Legislature intended that the regulatory provisions of the act apply only to municipal libraries taking advantage of such an optional tax assessment provision.

Moreover, former Education Code section 18950, which last authorized the levy of a municipal tax for the creation and support of public libraries, was repealed in 1977. Yet other sections of the Municipal Libraries Act, including those providing for the management of municipal public libraries by a board of library trustees, were left intact. If, as appellants contend, the act applied only to municipal public libraries funded by special library taxes, the Legislature would have repealed the entire act when it repealed provisions authorizing such funding. The failure to do so suggests a construction of the statutory scheme contrary to that advanced by appellants. (Cf. *Western Land Office, Inc.* v. *Cervantes* (1985) 175 Cal.App.3d 724, 741 [220 Cal.Rptr. 784]; *People* v. *Brannon* (1973) 32 Cal.App.3d 971, 977 [108 Cal.Rptr. 620].)

### III.

Appellants also argue that the fact that the 1883 Municipal Corporations Bill *followed* passage of the 1880 Municipal Libraries Act, demonstrates that the former was intended to confer upon cities additional, independent authority for the establishment and maintenance of free public libraries. Such an argument ignores historical reality. The 1883 Municipal Corporations Bill constituted the Legislature's earliest attempt at codifying provisions of the 1879 Constitution which addressed the organization, incorporation, and powers of all California cities. This sweeping legislation did not authorize the creation and operation of public libraries by all general law cities. Only cities having attained a population of more than 100,000 were empowered by the bill to establish, maintain, and regulate free public libraries. Similar powers were conferred upon cities of the sixth class (those having a population not exceeding 3,000 at the time of incorporation) in 1891, upon cities of the fifth and sixth class (those having a population not exceeding 20,000 at the time of incorporation) in 1949, and finally, upon all general law cities, regardless of population, in 1955.

The 1901 Municipal Libraries Act, under which the Monterey Park library was established, was the first version of the act to make the creation of a public library *mandatory* upon petition of one-fourth of the electors of a general law city. At that time in history, only general law cities with popu-

lations not exceeding 3,000, and those few cities with populations more than 100,000 at the time of incorporation,[8] were generally empowered by provisions of the Municipal Corporations Bill to establish, maintain and regulate free public libraries. Whether by enacting the 1901 Municipal Libraries Act, the Legislature intended to accord all other cities the power to establish free public libraries, despite the lack of authority to do so under the Municipal Corporations Bill, is a matter about which we decline to speculate.[9] It suffices to say that appellants inaccurately perceive the chronology of legislative events. The significance they attach to the supposed chronology is, accordingly, misplaced. There is nothing about the sequence of enactments which logically compels the conclusion that the Legislature enacted relevant portions of the 1883 Municipal Corporations Bill for the purpose of granting cities independent authority, apart from the Municipal Libraries Act, to establish and operate public libraries.

## IV.

Appellants cite *People* v. *Howard* (1892) 94 Cal. 73 [29 P. 485] as authority for the proposition that a city council may either comply with the Municipal Libraries Act or administer a city public library under "other authority." The case furnishes no authority for the proposition stated. In *People* v. *Howard,* the sole question was whether the Municipal Libraries Act of 1880, or the 1889 Los Angeles City Charter controlled the management of the Los Angeles Public Library. The library had been originally established in 1874 by special act of the Legislature. The Supreme Court held that the Los Angeles Public Library was not subject to the 1880 act because that law did not apply to libraries existing before 1880, established under " 'special laws and charters.' " (*Id*. at p. 76.) Los Angeles was at that time, and still is, a charter city not subject to the provisions of the Municipal Libraries Act. (Ed. Code, § 18963.)

Also cited as authority supporting Monterey Park's noncompliance with the Municipal Libraries Act is the case of *Bd. etc. Trustees* v. *Bd. of Trustees* (1906) 2 Cal.App. 760 [84 P. 227]. That case involved the City of Hanford, a city of the sixth class, organized in 1892 under the Municipal Corpora-

---

[8] By the 1900 federal census, only San Francisco and Los Angeles had populations exceeding 100,000. (Peppin II, *supra,* at p. 327, Appen. D.)

[9] Notably, under the 1880 version of the Municipal Libraries Act, in cities of less than 100,000 population, trustees were elected in the same manner as other town officers; in cities of more than 100,000 population, the mayor or chief executive officer, and 11 citizens appointed by the governor acted as trustees. (Stats. 1880, ch. 126, §§ 5, 6, p. 231.) In 1880, San Francisco was the only city with a population exceeding 100,000. (Peppin II, *supra,* at p. 327, Appen. D.) This relationship between the manner of selection of trustees and population was omitted from versions of the Municipal Libraries Act which succeeded the 1883 Municipal Corporations Bill.

tions Bill of 1883. Its library was created pursuant to the 1880 Municipal Libraries Act, and governed, at the time of the lawsuit, by the provisions of the 1901 act. The sole question was whether the city board of trustees or the board of library trustees was legally empowered to control the construction of a library building, where the money for construction was donated in trust to the city, by Andrew Carnegie, "for the express purpose of defraying the cost and expense of building and constructing . . . a building to be used only for the purpose of a public library . . . ." (*Id.* at p. 762.) The appellate court held that since the gift was to the city, and not to the board of library trustees, the city alone could carry out the purposes of the trust, namely, the erection of a building to be used for a public library. The court relied on a provision of the 1901 Municipal Libraries Act requiring application of money acquired by gift to the use of the library " 'in accordance with the terms and conditions of such gift' " whenever the conditions of the gift are inconsistent with the provisions of the act. (*Id.* at p. 765; see Stats. 1901, ch. 170, §§ 5, 8.) The case does not, as appellants suggest, hold that public libraries in cities organized under the general law need not be *operated* in compliance with the Municipal Libraries Act (Ed. Code, § 18900 et seq.).

## V.

As evidence that the Legislature contemplated the existence of forms of library management other than by a board of library trustees, appellants point to Education Code section 18927, which provides, in relevant part: "The board of library trustees, *or if there is no board of trustees,* then the administrative head of the library shall, on or before August 31st, in each year, report to the legislative body of the municipality and to the State Librarian on the condition of the library, for the year ending the 30th day of June preceding." (Italics added.) Appellants overlook the fact that such a provision, requiring annual reporting by the administrative head of the library in the absence of a board of library trustees, would have no application to a library excused from complying with the Municipal Libraries Act. Such a library would not be required to comply with the *reporting* requirements of the act in the first instance. We decline appellants' invitation to construe the alternative reporting provisions of Education Code section 18927 as granting broad authority to general law cities to operate their public libraries without regard to the requirements of the Municipal Libraries Act.

## VI.

Effective September 26, 1988, Government Code section 53717 authorizes any city, county, city or county, or library district to impose special taxes "for the purpose of providing public library facilities and services as

described Chapter 1.5 (commencing with Section 18010) of Part 11 of the Education Code." (See 36A West's Ann. Gov. Code (1989 supp.) § 53717, p. 111; Deerring's Ann. Gov. Code (1989 supp.) § 53717, p. 68.) Prior to the enactment of Government Code section 53717, the Mello-Roos Community Facilities Act of 1982 (Mello-Roos Act) (Gov. Code, div. 2, tit. 3, pt. 1 (commencing with Gov. Code, § 53311)) already permitted any political subdivision of the state, including cities, to impose taxes through community facilities districts to finance, among other things, library facilities and services. (See Gov. Code, §§ 53313, 53313.5.) ■ Appellants aver that, because the Mello-Roos Act already authorized taxes to support public libraries, the Legislature must have assumed that separate authority was necessary to impose special taxes to support libraries subject to the provisions of the Municipal Libraries Act. They suggest that those provisions of the Mello-Roos Act which authorize special library taxes are unnecessary and duplicative of Government Code section 53717 if the Municipal Libraries Act is the exclusive source of authority for the operation of city public libraries.

In advancing such an argument, appellants misread Government Code section 53717, and ignore the fundamental differences between that statute and the provisions of the Mello-Roos Act. ■ The Mello-Roos Act was enacted for the express purpose of providing "an alternative method of financing certain public capital facilities and services, especially in developing areas and areas undergoing rehabilitation." (Stats. 1982, ch. 1439, § 1, p. 5486.) While the enactment does not itself explain why "alternative" methods of financing were required, recent history does.

In June 1978, voter approval of the much debated Proposition 13 (adding art. XIII A to Cal. Const.) severely impaired local governments' ability to raise money through property taxes by rolling back property tax rates and requiring a two-thirds vote of the affected community before any new tax could be imposed. (See *Huntington Park Redevelopment Agency* v. *Martin* (1985) 38 Cal.3d 100, 105 [211 Cal.Rptr. 133, 695 P.2d 220].) The 1982 Mello-Roos Act sought to ameliorate this problem by authorizing the creation of community facilities districts, defined as "a legally constituted governmental entity established for the purpose of carrying on specific activities within definitely defined boundaries" (Stats. 1982, ch. 1439, § 1, pp. 5486-5499) empowered to impose special taxes to pay for specified services and facilities within the district. The 1982 act authorized the creation of such districts by any "local agency," defined as "any city or county, whether general law or chartered, special district, or any other municipal corporation or district." (Stats. 1982, ch. 1439, § 1, p. 5489.)

The original version of the act permitted the use of community facilities districts *only* to provide specified facilities and services "to the extent that

they [were] in addition to those provided in the territory of the district before the district was created, and . . . not [used to] supplant specific facilities of these kinds and levels of these services already available within the territory." (Stats. 1982, ch. 1439, § 1, p. 5487.) Such a district could be created and a special tax imposed only if two-thirds of the registered voters residing within the proposed community facilities district approved. Alternatively, if fewer than 12 registered voters resided within the proposed district, the district could be created and the tax imposed upon approval by two-thirds of the votes cast by the landowners of the proposed district, each landowner having 1 vote for each acre or portion thereof owned. (Stats. 1982, ch. 1439, § 1, 5491.)[10]

In practice, the Mello-Roos Act has been used by local governments to finance new facilities and services, such as roads, fire stations, schools, parks and public libraries, for new developments. Upon approval by the owner of two-thirds of the acreage to be developed, the local governing body of a city, county, or other political subdivision of the state commonly issues bonds to pay for the specified facilities and services. The bonds are then repaid, usually by the subsequent purchasers and/or residents of the improved property, with the revenues collected pursuant to the approved special tax. (See Johnston, *Anaheim OKs Special Taxes for Two Areas,* L.A. Times, Orange County ed. (Feb. 22, 1989) Metro pt. 2, p. 3, col. 5; McMillan, *Antelope Valley Home Buyers Soaked With Big Water Bill,* L.A. Times, Home ed. (May 16, 1988) Metro pt. 2, p. 1, col. 1; Schine, *Orange County Growth Issue Drying Up Builder Financing Source,* L.A. Times, Orange County ed. (Feb. 19, 1988) Business pt. 4, p. 1, col. 2; Billiter, *Special-Tax Pact to Help Capistrano Schools Deal With Growth,* L.A. Times, Orange County ed. (Mar. 21, 1987) Metro pt. 2, p. 5, col. 1; Surman, *Construction Bonds to Be Repaid With Property Tax Boost: Six Developers Will Join School Assessment District: Corona Norco,* L.A. Times, Orange County ed. (Feb. 10, 1985) Metro pt. 2, p. 3, col. 1.)

▮ Government Code section 53717 states, in relevant part, that "any city, county, city or county, or library district may impose special taxes for the purpose of providing public library facilities and services as described in Chapter 1.5 (commencing with section 18010) of part 11 of the Education Code." Appellants mistakenly assume that designated chapter and section numbers refer to the provisions of the Education Code governing the estab-

---

[10]The Mello-Roos Act was repealed and reenacted in 1984. Among other changes, the 1984 act added a provision authorizing the purchase, construction, expansion or rehabilitation of real property by a community facilities district for the purpose of providing a library facility. (Stats. 1984, ch. 269, § 2.3, p. 1409.) In 1986, the act was amended, in relevant part, to authorize the financing of library services through the creation of community facilities districts. (Stats. 1986, ch. 1102, § 2.)

lishment and operation of city libraries. They do not. Chapter 1.5, entitled "Public Library Finance" was enacted to "[effect] a state policy that each public library provide a minimum level of service, known as the foundation program, to the extent state funds are made available for that purpose as prescribed by this chapter." (Ed. Code, § 18013.) "Foundation program" is defined by Education Code section 18015 as "those elements of library service which are basic to its function as a provider of information, education, and cultural enrichment to all segments of the community, including, but not limited to, collection development and maintenance, lending services, information services, facility maintenance, and administration." Section 18015 specifically excludes from the definition of a foundation program "major capital improvements, which, for purposes of this chapter, shall be defined as the purchase of real property, the construction or improvement of buildings, and the purchase of equipment and the payment of fees or other costs in connection with the same."

Chapter 1.5: (1) requires determination in each fiscal year of the population served by each public library of the state, according to the most current state or federal population estimates (Ed. Code, § 18021); (2) establishes a statewide per capita cost of the foundation program (Ed. Code, § 18020); (3) establishes a method for calculating the total cost of the foundation program for each public library in the state (Ed. Code, § 18022); (4) requires annual reporting by each public library in the state of the total revenue appropriated for the foundation program for the fiscal year (Ed. Code § 18023); (5) creates in the state treasury a public library fund in an amount necessary to meet the state's obligations under chapter 1.5 (Ed. Code, § 18024); and (6) provides for state funding of the foundation program for each public library in an amount equal to 10 percent of its cost, provided that local revenues appropriated for the program are not less than 90 percent of the cost, and further provided that local revenues for the fiscal year are at least equal to the total of local revenues appropriated for the public library in the previous fiscal year (Ed. Code, §§ 18025, 18026).

Government Code section 53717 does not merely authorize the imposition of special taxes for the purpose of providing public library facilities and services governed by the Municipal Libraries Act (Ed. Code § 18900 et seq.). It is manifest that that section was enacted for special and limited purpose of allowing political subdivisions of the state to raise revenues through the use of special library taxes to fund the public library foundation program mandated by state law. ■■■ The Mello-Roos Act, on the other hand, was enacted to ameliorate local revenue shortages created by the passage of Proposition 13. ■■■ We fail to see how the existence of these two disparate enactments evidences a legislative intent to authorize the

establishment and operation of municipal public libraries under more than one statutory scheme.

VII.

■ Appellants contend that, assuming the Bruggemeyer Library must be operated in compliance with the Municipal Libraries Act, the Monterey Park City Council was nevertheless empowered to discharge the board of library trustees without cause or hearing. Reliance is placed on Government Code section 36506, which provides: "By resolution or ordinance, the city council shall fix the compensation of all appointive officers and employees. Such officers and employees hold office [at] the pleasure of the city council." The plain language of the Municipal Libraries Act compels a contrary conclusion.

Education Code section 18910 provides that a public library established under the act "*shall* be managed by a board of library trustees, consisting of five members, . . ." (Italics added.) According to Education Code section 18911, the trustees "*shall* hold office for three years." (Italics added.) Section 18960 of the Education Code still provides that any library established pursuant to the Municipal Libraries Act "*shall* be . . . subject always to such rules, regulations, and bylaws as may be made by boards of library trustees." (Italics added.) ■ Use of the word "shall" in a statute "imports that its provisions are mandatory, as long as that meaning is in accord with the legislative intent." (*Doyle* v. *Board of Supervisors* (1988) 197 Cal.App.3d 1358, 1364 [243 Cal.Rptr. 572]; *Francis* v. *Superior Court* (1935) 3 Cal.2d 19, 29 [43 P.2d 300].) A mandatory construction of the word "shall" in the above provisions is entirely consistent the legislative purpose underlying the Municipal Libraries Act and related statutory schemes: to promote by means of a comprehensive regulatory scheme and, to the extent necessary, state financial support, a statewide, cooperative network of local free public libraries.

Moreover, when the Legislature uses both "shall" and "may" in close proximity in a statutory scheme, it may be inferred that the Legislature intended mandatory and discretionary meanings, respectively. (*In re Richard E.* (1978) 21 Cal.3d 349, 353-354 [146 Cal.Rptr. 604, 579 P.2d 495]; *Morin* v. *ABA Recovery Service, Inc.* (1987) 195 Cal.App.3d 200, 207 [240 Cal.Rptr. 509].) Numerous other provisions of the Municipal Libraries Act employ the word "may" to describe the discretionary powers accorded the board of library trustees. (See, e.g., Ed. Code, §§ 18919-18926.)

■ A mandatory construction of the word "shall" finds additional support in the legislative history. The 1878 Municipal Libraries Act

empowered the "municipal authorities" of any town or city to appoint trustees, to fix their terms of office (not exceeding four years), and "at their pleasure, on the request of a majority of the Trustees, [to] remove any from office, and fill vacancies . . . ." (Stats. 1878, ch. 266, § 2, p. 329.) The 1880 act included a provision allowing removal of a trustee "for good cause" in the same manner provided for the removal of other city officers. (Stats. 1880, ch. 126, § 7, p. 231.) Subsequent versions of the act omit any provision for the discretionary removal of trustees, with or without good cause. ▪ "When the Legislature enacts a new law on the same subject as a prior law or makes a material amendment or change to an existing statute, we presume a legislative purpose to change existing law." (*People* v. *Parkmerced Co.* (1988) 198 Cal.App.3d 683, 690 [244 Cal.Rptr. 22]; see also *Louisiana-Pacific Corp.* v. *Humboldt Bay Mun. Water Dist.* (1982) 137 Cal.App.3d 152, 159 [186 Cal.Rptr. 833].)

▪ In any event, appellants have not merely discharged and replaced members of the board of library trustees. The offending ordinance abolishes altogether the offices of trustees and provides for operation and management of the Bruggemeyer Library by the Monterey Park City Council. Upon establishment of a public library under the Municipal Libraries Act, appellants were required by state law to appoint a board of library trustees. ▪ A local office mandated by state law may not be abolished by local ordinance. (*De Merritt* v. *Weldon* (1908) 154 Cal. 545, 549 [98 P. 537]; cf. *Martello* v. *Superior Court* (1927) 202 Cal. 400, 408 [261 P. 476].) A contrary conclusion is not compelled merely because the library was itself established by local ordinance.

## VIII.

▪ Appellants contend that the superior court abused its discretion by extending the terms of incumbent trustees by seven months, the approximate length of time the trustees were deprived of their offices by appellants' unlawful action. The remedy ordered was a reasonable means of rectifying the wrong caused by appellants.

Appellants argue that the trial court's remedy violates a provision of the Municipal Libraries Act which requires that the terms of trustees expire at the end of the fiscal year. (Ed. Code, § 18911.) Education Code section 18911 provides, in relevant part: "The trustees shall hold office for three years. *The members of the first board appointed shall so classify themselves by lot that one of their number shall go out of office at the end of the current fiscal year, two at the end of one year thereafter, and two at the end of two years thereafter.*" (Italics added.) On its face, the statute merely provides for the staggering of terms of the first board of library trustees, the end of each

term to coincide with the end of the fiscal year. Even assuming the statute by implication requires that all successor trustees' terms expire at the conclusion of the city's fiscal year, the terms of incumbent trustees were not in compliance with this provision of section 18911 *before* their offices were abolished by the city council and reinstated by the superior court.[11]

Any violation of Education Code section 18911 is, accordingly, not the result of the superior court's order. If appellants wish to further *extend* trustees' terms to effect compliance with that section, there is nothing in the trial court's order which prohibits them from doing so.

Respondents request that the terms of incumbent trustees be further extended to compensate for additional time they have been deprived of office during the pendency of this appeal. The request is reasonable.

The orders under review are affirmed. The matter is remanded to the trial court with directions to recalculate the total period of time that each incumbent trustee was deprived of his or her office by appellants' unlawful action and the pendency of this appeal, and to amend its writ of mandate to extend said trustees' terms accordingly, to effectuate the three-year terms required by Education Code section 18911. Each of the parties is to bear its own costs on appeal.

The orders under review are affirmed.

Roth, P. J., and Compton, J., concurred.

---

[11] The terms of incumbent trustees would have expired: for Francisco Alonso, on March 30, 1990; for Caroline Chen, on July 7, 1990; for Michael Eng, on September 9, 1988; and for Caroline Zook, on June 12, 1990.