Filed 10/13/16

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| BUILDING INDUSTRY ASSOCIATION OF THE BAY AREA,<br><br>      Plaintiff and Appellant,<br><br>v.<br><br>CITY OF SAN RAMON et al.,<br><br>      Defendants and Respondents. | A145575<br><br>(Contra Costa County<br>Super. Ct. No. MSC1400603) |

A developer sought approval from the City of San Ramon (City) to build 48 townhouses on two parcels of land. Because an analysis showed that the cost to the City of providing services to the new development would exceed the revenue generated by the project, the City conditioned its approval on the developer providing a funding mechanism to cover the difference. Using California's Mello-Roos Act, the developer petitioned the City to create a "community facilities district" and then, as landowner, voted to approve a tax within the district consistent with the statute to raise the necessary revenue. Plaintiff Building Industry Association-Bay Area (the Association) filed suit against the City in superior court challenging the validity of the tax. After the parties filed cross-motions for summary judgment, the trial court upheld the tax. It is from this judgment that the Association now appeals on multiple grounds: the tax does not provide for "additional services" as required by statute; the tax is an unconstitutional general tax; and the City ordinance authorizing the tax is unconstitutional on its face because it "retaliates" against property owners by ceasing the provision of services funded by the tax if property owners in the district repeal the tax in the future.

We conclude that the tax will provide "additional services" to meet increased demand for existing services resulting from the townhouse development and therefore meets the requirements of the Mello-Roos Act; the tax is a special (and not a general) tax because it is imposed for specific purposes and not for general governmental purposes, and therefore meets the requirements of the California Constitution; and the property owners' constitutional and statutory rights are not burdened by an ordinance explaining that the city services funded by a special tax will not be provided by the city if the tax is repealed. Consequently, we will affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

A.    *The Mello-Roos Act*

The Legislature intended the Mello-Roos Community Facilities Act of 1982 (Gov. Code, § 53311 et seq.), commonly known as the Mello-Roos Act, and here sometimes referred to as "the Act," to "provide[] an alternative method of financing certain public capital facilities and services, especially in developing areas and areas undergoing rehabilitation." (Gov. Code, § 53311.5.[1]) "Alternative" methods of financing were needed because four years earlier, in 1978, the voters approved Proposition 13, which added article XIII A to the California Constitution and "severely impaired local governments' ability to raise money through property taxes." (*Friends of the Library of Monterey Park v. City of Monterey Park* (1989) 211 Cal.App.3d 358, 376 (*Monterey Park*).) Among other things, Proposition 13 restricted the imposition of "special taxes" by local governments. (Cal. Const., art. XIII A, § 4.) Our Supreme Court ruled that the term "special taxes" in Proposition 13 meant "taxes which are levied for a specific

---

[1] Government Code section 53311.5 states, "*This chapter provides an alternative method of financing certain public capital facilities and services, especially in developing areas and areas undergoing rehabilitation.* The provisions of this chapter shall not affect or limit any other provisions of law authorizing or providing for the furnishing of governmental facilities or services or the raising of revenue for these purposes. A local government may use the provisions of this chapter instead of any other method of financing *part or all* of the cost of providing the authorized kinds of capital facilities and services." (Emphasis added.)

purpose rather than . . . a levy placed in the general fund to be utilized for general governmental purposes." (*City and County of San Francisco v. Farrell* (1982) 32 Cal.3d 47, 57.)

"Before Proposition 13 was adopted, local governments could usually impose special taxes without any voter approval." (Curtin, et al., Cal. Subdivision Map Act and the Development Process (Cont.Ed.Bar 2d ed. 2015) Use of Local Government Districts to Provide Facilities and Services, § 6A.27, p. 6A-33(Curtin), citing Cal. Const., art. XI, § 5, Gov. Code § 37100.5, and *Associated Home Builders v. City of Newark* (1971) 18 Cal.App.3d 107.) Proposition 13 required that special taxes be approved by a two-thirds vote of the local voters (Cal. Const., art. XIII A, § 4), and prohibited local governments from levying special taxes in the absence of state enabling legislation. (*California Building Industry Association v. Governing Board* (1988) 206 Cal.App.3d 212, 230.) In passing the Mello-Roos Act, the Legislature sought to address the limitations on local governments' ability to raise money by passing enabling legislation that "authoriz[ed] the creation of community facilities districts . . . empowered to impose special taxes to pay for specified services and facilities within the district." (*Monterey Park*, *supra*, 211 Cal.App.3d at p. 376; see also Curtin, *supra*, § 6A.55, pp. 6A-52 - 6A-54.)

The Act authorizes the creation of community facilities districts by "all local agencies," defined to include any city. (Gov. Code, §§ 53316 & 53317, subd. (h).[2]) These community facilities districts are commonly known as "Mello-Roos districts." A community facilities district may be established to finance one or more types of specified services (§ 53313) or facilities (§ 53313.5), or both.[3] Once a local agency has approved

---

[2] All further unspecified statutory references are to the Government Code.

[3] In the Mello-Roos Act, " 'Services' means the provision of categories of services identified in Section 53313. 'Services' includes the performance by employees of functions, operations, maintenance, and repair activities. 'Services' does not include activities or facilities identified in Section 53313.5. 'Maintenance' shall include replacement, and the creation and funding of a reserve fund to pay for a replacement." (§ 53317, subd. (j).) Section 53313 provides that a Mello-Roos district may be created to finance any one or more of several specified types of services, including police protection

3

the formation of a district, the agency's legislative body must submit the levy of any special tax to the voters for approval. (§ 53326, subd. (a).) If there are not at least 12 persons registered to vote in the proposed district on each of the 90 days preceding the election, the vote is by the landowners of the real property in the district.[4] (§§ 53317, subd. (f) & 53326, subd. (b).) In both types of election, approval of the tax requires approval by two-thirds of the votes cast. (§ 53328.)

The Act brought about a sea change in local government financing. (See *Monterey Park*, *supra*, 211 Cal.App.3d at pp. 376-377.) "Before enactment of the Mello-Roos Act in 1982, local governments used assessment districts to finance improvements (such as sewer, water, streets, and drainage) that directly benefited a particular parcel of property. Special assessment financing was not disturbed by enactment of Proposition 13, but the use of assessment districts was historically confined to financing local improvements that conferred a special and direct benefit on the assessed property. The Mello-Roos Act liberalized the traditional constraints on local improvement financing and also permitted financing certain facilities and services that benefit the public generally, such as police and fire protection, recreation programs, library services, flood and storm protection services, and park maintenance." (Curtin, *supra*, § 6A.55, p. 6A-53, citing Gov. Code, § 53313.) "The main advantage of a Mello-Roos district is that taxes imposed under the Mello-Roos Act are special taxes, not special assessments. Govt C §53325.3. A district's taxes need not, therefore be apportioned on the basis of benefit to any property. Govt C §53325.3." (*Ibid.*)

In particular, the Act has affected the way in which facilities and services are financed for new developments. (See *Monterey Park*, *supra*, 211 Cal.App.3d 358.) "Typically, when facilities have been financed by imposing fees on the project developer,

---

services, fire protection services, recreation program services, maintenance and lighting of parks and streets, removal or cleanup of hazardous substances, and the maintenance and operation of certain property.

[4] Each landowner has "one vote for each acre or portion of an acre of land that he or she owns within the proposed community facilities district not exempt from the special tax." (§ 53326, subd. (b).)

4

those fees are passed on to purchasers or units in the form of higher sale prices. By using a Mello-Roos district, however, both the local public agency and the developer avoid incurring any general obligation indebtedness to finance the needed improvements or services, because the cost is borne solely by residents of the benefited area."[5] (Curtin, *supra*, § 6A.55, pp. 6A-53 - 6A-54.)

B.      *The City Establishes a Community Facilities District and Levies a Tax*

In 2013, the City's Planning Commission and the City Council tentatively approved the subdivision of two parcels of land to create a 48-unit townhouse project known as the Acre Development (Acre). The approval process included a fiscal analysis, which determined that the cost of providing services to Acre would exceed revenue generated by Acre, thus creating a negative fiscal impact to the City of about $500 per year for each townhouse. As a condition of approval, the City required Acre's developer to provide a funding mechanism to mitigate the negative fiscal impact.

To satisfy the condition, the landowner-developer petitioned the City Council to initiate proceedings under the Mello-Roos Act to create a community facilities district consisting of the two parcels to be developed. The City Council began those proceedings

---

[5] This effect has long been understood. Pursuant to Evidence Code sections 452, subdivision (c) and 459, subdivision (c), we take judicial notice of the legislative history of Senate Bill 2254 (1987-1988 Reg. Sess.) on our own motion, having previously notified the parties of our intent to do so. In recommending that Governor Deukmejian sign S.B. 2254, which among other things revised procedures for notifying land purchasers of taxes levied under the Act, the Office of Local Government Affairs reported, "Because [Mello-Roos] districts are often formed in undeveloped areas with few voters and finance infrastructure or services associated with new construction, the original landowners effectively use the Mello-Roos Act to shift the costs of new infrastructure and services to new homeowners. The success of the Mello-Roos Act in financing the needs of new development has always been tempered by complaints from new homeowners that they are not being made aware of the existence of special taxes at the time they buy their house. SB 1115 (Mello) of 1986 addressed this problem by requiring the recordation of a special tax notice upon formation of a new Mello-Roos [district]. [¶] SB 2254 would require the recordation of a special tax lien. This would assist in the disclosure of such taxes to home buyers." (Office of Local Government Affairs, Enrolled Bill Rep. on Sen. Bill No. 2254 (1987-1988 Reg. Sess.) Sept. 22, 1988, p. 3.)

by adopting a resolution of intention to establish a community facilities district comprised of the two parcels designated for Acre and a "future annexation area" that is essentially co-extensive with the City limits (the District).[6]

In February 2014, the City conducted a public hearing after which it adopted a resolution approving the formation of the district, proposing a tax to be levied on parcels in the district, and describing the facilities and services to be financed. The provision of facilities is not at issue in this appeal. The services to be financed were described as follows:

"The Services shown below ('services' shall have the meaning given that term in the Mello-Roos Community Facilities Act of 1982[7]) are proposed to be financed by the [District], including all related administrative costs, expenses and related reserves for replacement of vehicles, equipment and facilities:

"• Annual operation, maintenance and servicing, including repair and replacement, of police, park and recreational facilities, open space facilities, landscaping facilities, street and street lighting facilities, flood and storm protection facilities and storm water treatment facilities.

"• To the extent not included in the prior paragraph, police, park and recreational services (excluding recreation program services), open space services, landscaping services, street and street lighting services, flood and storm protection services, and storm water treatment services.

"• Costs associated with the setting, levy, and collection of the Special Taxes; and

"• Contingency costs, including a contingency and/or reserve for operating and capital reserves, as required by the City.

---

[6] The future annexation area is not at issue in this appeal.

[7] There is no dispute that the services to be funded by the tax are among the types of services authorized by the Mello-Roos Act. (See §§ 53313 and 53317, subd. (j) [defining "services" with reference to § 53313].)

6

"The Special Taxes may be collected and set-aside in designated funds, collected over several years, that may be used by the City to fund future repairs, services and facilities described above as determined by the City."

Because there were fewer than 12 registered voters in the territory of the district, a landowner election was held. The sole landowner and qualified elector (the developer of Acre) approved the levy of the tax.[8]

The City then adopted an ordinance providing, among other things, "All of the collections of the special tax shall be used as provided for in the [Mello-Roos] Act and in the Resolution of Formation." As we will see, whether this is a permissible "special tax" or, as the Association claims, an impermissible "general tax" is a central issue in this case.

One of the provisions incorporated in the ordinance states that if the tax should be repealed by action of the voters in the district, the City will stop levying the tax, and will not be obligated to provide the facilities and services for which the tax was levied, and the property owners in the district will be responsible for any obligations that had been funded by the repealed tax.

C.      *The Association Files Suit*

In March 2014, the Association sued the City[9] seeking to invalidate and annul the resolutions and ordinance pertaining to the district and the tax. The Association sought a declaration of invalidity under Code of Civil Procedure sections 860 and 863 and Government Code section 53359 or, in the alternative, declaratory relief under Code of Civil Procedure section 1060 or a writ of mandate under Code of Civil Procedure section 1085. The Association made three contentions: First, the tax did not comply with the requirement of the Mello-Roos Act that services financed by a landowner-approved

---

[8] The tax is to be imposed on every parcel in the district, with a maximum initial tax rate for townhouses of $595 per year.

[9] The Association sued the City of San Ramon and the Mayor and City Council of San Ramon in their official capacities. We follow the parties in referring to the defendants/respondents collectively as "the City."

7

community facilities district must be "in addition to those provided in the territory of the district before the district was created" and "may not supplant services already available within that territory when the district was created." (§ 53313.) Second, the tax was an improper general tax, rather than a special tax, and therefore violated section 2, subdivision (a) of article XIII C of the California Constitution, which prohibits a special purpose district from levying a general tax. Third, the ordinance retaliated against landowners in the district who might in the future seek relief from the tax, because the ordinance improperly burdened their constitutional rights to petition the government and their statutory rights to seek relief through the courts.

The Association filed a motion for summary judgment and the City filed a cross motion. The trial court denied the Association's motion and granted the City's, ruling that the tax complies with the Mello-Roos Act because the services it funds will augment, not supplant, the current services in the territory; that the tax is a special tax, not a general tax; and that the ordinance is not unconstitutional.[10] Final judgment was entered in favor of the City, and this appeal followed.[11]

---

[10] In its ruling, the trial court rejected the City's arguments that the Association lacked standing and that the Association's challenge was not ripe with respect to the district's future annexation area. Those issues are not before us.

[11] We granted the League of California Cities' (the League's) application to file an amicus curiae brief in support of the City; the Association subsequently filed an answering brief. With its application, the League requested us to take judicial notice, pursuant to Evidence Code section 452, subdivision (h), of a 600-page September 2014 report by the California Tax Foundation entitled, "Piecing Together California's Parcel Taxes: An In-Depth Survey of Local Special Taxes on Property." The League claims the report is relevant because, "It demonstrates the widespread use and public approval of [Mello-Roos] taxes, the many services they fund, and the importance of [Mello-Roos] revenues to the public fisc." The Association opposed the request on various grounds. We took the request under submission to decide with the merits of the appeal and now deny it.

Evidence Code section 452, subdivision (h) permits the court to "take judicial notice of '[f]acts and propositions' within the document, not the document as a whole." (*Jenkins v. JP Morgan Chase Bank, N.A.* (2013) 216 Cal.App.4th 497, 536 [quoting Evid. Code, § 452, subd. (h)], disapproved on other grounds in *Yvanova v. New Century Mortgage Corporation* (2016) 62 Cal.4th 919.) The League has not identified specific

8

We review a grant of summary judgment de novo, effectively assuming the role of a trial court, and applying the rules and standards that govern a trial court's determination of a motion for summary judgment. (*Lonicki v. Sutter Health Central* (2008) 43 Cal.4th 201, 206 (*Lonicki*).) Code of Civil Procedure section 437c, subdivision (c) provides that a "motion for summary judgment shall be granted if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Because the material facts here are undisputed, this matter presents pure questions of law.

A.      *The Tax Complies with the Mello-Roos Act*

Section 53313 provides that a Mello-Roos tax approved by a landowner vote "may only finance . . . services . . . to the extent that they are in addition to those provided in the territory of the district before the district was created. The additional services shall not supplant services already available within that territory when the district was created." (§ 53313, subd. (g).) The Association contends that the tax does not meet the requirements of section 53313 because a tax that pays for increased quantities of existing services to meet increased demand does not pay for "additional service[s]."[12] The City contends that the services financed by the tax are "post-development *additional* levels of service," which "do not *supplant* the predevelopment levels of service all of which continue to be funded with general fund revenue."

facts and propositions within the report for judicial notice, which is highly problematic because the report includes opinions and recommendations as well as an appendix of over 550 pages that describes parcel taxes imposed under the authority of a number statutes, not limited to the Mello-Roos Act. Furthermore, even if we assume that the facts and propositions included in the report are "capable of immediate and accurate determination by resort to sources of reasonably indisputable accuracy" (Evid. Code, § 452, subd. (h)), neither the number of Mello-Roos districts in the state nor the range of services funded by other such districts are relevant to the dispositive issues in this appeal. (See *Jordache Enterprises, Inc. v. Brobeck, Phleger & Harrison* (1998) 18 Cal.4th 739, 748, fn. 6 [denying request where judicial notice is neither necessary, helpful, or relevant].)

[12] The Association does not contend that the tax violates the Mello-Roos Act in any other respect.

The parties rely on the following undisputed facts: The enumerated services that will be funded by the tax are services currently provided by the City to parcels within the City limits, including the parcels where Acre will be developed. The City currently provides these enumerated services at a level that is generally adequate to meet the existing demand. The City intends to use the tax revenues to meet the increased demand for the enumerated services expected to result from the development of Acre. Once the tax is imposed and the district is developed, property in the district (where the tax is levied) will receive services that are qualitatively no better than the services received by property outside the district, even though district property owners are paying an additional tax.

1.     *Applicable Law*

"In interpreting a statute, we begin with its text, as statutory language typically is the best and most reliable indicator of the Legislature's intended purpose. (*Fitch v. Select Products Co.* (2005) 36 Cal.4th 812, 818; see also *Baker v. Workers' Comp. Appeals Bd.* (2011) 52 Cal.4th 434, 442.) We consider the ordinary meaning of the language in question as well as the text of related provisions, terms used in other parts of the statute, and the structure of the statutory scheme. (See *Lonicki*[, *supra*,] 43 Cal.4th [at p.] 209; *California Teachers Assn. v. San Diego Community College Dist.* (1981) 28 Cal.2d 692, 698; see also *Clean Air Constituency v. State Air Resources Bd.* (1974) 11 Cal.3d 801, 813-814; *People v. Rogers* (1971) 5 Cal.3d 129, 142 (conc. & dis. opn. of Mosk, J.) [in construing a statute, we do not look at each term as if 'in a vacuum,' but rather gather 'the intent of the Legislature . . . from the statute taken as a whole'].)" (*Larkin v. Workers' Comp. Appeals Bd.* (2015) 62 Cal.4th 152, 157-158 (*Larkin*).)

The role of the court in construing a statute "is simply to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted, or to omit what has been inserted; and where there are several provisions or particulars, such a construction is, if possible, to be adopted as will give effect to all." (Code Civ. Proc., § 1858.) " ' " 'Words must be construed in context, and statutes must be harmonized, both internally and with each other, to the extent possible.' [Citation.] Interpretations

10

that lead to absurd results or render words surplusage are to be avoided.  [Citation.]"
[Citation.]'  (*People v. Loeun* (1997) 17 Cal.4th 1, 9.)"  (*Tuolumne Jobs & Small Business Alliance v. Superior Court* (2014) 59 Cal.4th 1029, 1037.)

"If the statutory language in question remains ambiguous after we consider its text and the statute's structure, then we may look to various extrinsic sources, such as legislative history to assist us in gleaning the Legislature's intended purpose.  (*Holland v. Assessment Appeals Bd. No. 1* (2014) 58 Cal.4th 482, 490.)"  (*Larkin*, *supra*, 62 Cal.4th at p. 158.)

2.      *Analysis*

For the purposes of this appeal, we consider two requirements imposed by section 53313 on services funded by landowner-approved taxes:  the services must be "in addition to those provided in the territory of the district before the district was created" and "[t]he additional services shall not supplant services already available within that territory when the district was created."  The parties cite no decisions that interpret these requirements of section 53313, and we are aware of none.

a.      *Interpreting Section 53313*

In order to determine whether the requirements of section 53313 are met by providing services that satisfy an increased demand for existing services, we look at the language of section 53313 and its place in the Mello-Roos Act.  From our understanding of the ordinary meaning of the language in section 53313, it seems clear from the outset that the additional services requirement is met by services that meet increased demand for existing services within the district.  Such services would be "in addition to" the services provided in the area of the district before the district was created.  Moreover, services that meet increased demand do not "supplant" the services available in the area of the district when the district was created, because they do not replace those services.  To the contrary, they supplement those services.

Our understanding of the statutory language is consistent with the dictionary definitions of "additional" and "supplant" that were presented by the City to the trial court, and recognized by the Association as being probative, though not dispositive, of

11

the meaning of the statute. The Oxford Dictionaries define "additional" as "[a]dded, extra, or supplementary to what is already present or available." (<http://www.oxforddictionaries.com/us/definition/american_english/additional> [as of Oct. 13, 2016].) Merriam-Webster defines "supplant" as "to take the place of and serve as a substitute for especially by reason of superior excellence or power." (<http://merriam-webster.com/dictionary/supplant> [as of Oct. 13, 2016].)

Other provisions of the Mello-Roos Act support our analysis. Section 53311.5 explains that the purpose of the Act is to finance the facilities and services in developing areas and areas undergoing rehabilitation, precisely the situations that would likely lead to increased demand for the services authorized in section 53313. And section 53326, subdivision (b), requires that when taxes are approved by landowner vote, "the legislative body shall determine that any facilities or services financed by the district are necessary to meet increased demands placed upon local agencies as the result of development or rehabilitation occurring in the district." There is no dispute that such a determination was made in this case.

Section 53313 requires that the services provided by landowner-approved taxes must not only be necessary to meet increased demands (see § 53326, subd. (b)), but must also supplement and not replace existing services.[13] These requirements are common in statutes that establish new sources of funding. For example, Penal Code section 1202.5, which imposes an additional $10 fine on defendants convicted of certain offenses, specifies that the amounts collected, which are intended for crime prevention programs, "*shall be in addition to and shall not supplant* funds received for crime prevention purposes from other sources." (Pen. Code, § 1202.5, subd. (b)(2), emphasis added.) Health and Safety Code section 11372.7, which establishes a drug program fee to be paid by defendants convicted of certain code violations, requires that the funds "deposited into

---

[13] These section 53313 requirements do not apply to *facilities* funded by landowner approved taxes, perhaps because facilities age and decay and may need to be "supplant[ed]," as we discuss below in connection with the history of the Mello-Roos Act.

12

a county drug program fund pursuant to this section *shall supplement and shall not supplant*" local funds to support those efforts. (Health & Saf. Code, § 11372.7, subd. (d), emphasis added.)

The text of section 53313 and the structure of the Mello-Roos Act suffice to support our interpretation: landowner-approved taxes may fund services that meet increased demand in the district for existing services. The legislative history of the bills drafting and later amending the statutory language provides further support, because from the first enactment of the Mello-Roos Act in 1982, the legislature was clear that landowner-approved Mello-Roos taxes could be used to satisfy an increased demand for existing services.[14]

As first enacted, section 53313 pertained to facilities as well as services, and authorized the creation of a Mello-Roos district to provide the following types of "additional facilities and services" of the following types within an area: "[p]olice protection, including criminal justice facilities limited to jails, detention facilities and juvenile halls," and "[f]ire protection and suppression, and provision of ambulance and paramedic facilities and services." (Former § 53313, added by Stats. 1982, ch. 1439, § 1, p. 5487, and repealed by Stats. 1984, ch. 269, § 1, p. 1408.) The statute went on to explain what constituted "additional facilities and services" by requiring that, "A community facilities district may only provide the specific facilities and *levels of services* authorized in this section to the extent that they are in addition to those provided in the territory of the district before the district was created, and may not supplant specific facilities of these kinds and levels of these services already available within that territory." (Former § 53313, added by Stats. 1982, ch. 1439, § 1, p. 5487, and repealed by Stats. 1984, ch. 269, § 1, p. 1408 (emphasis added).) These requirements were not limited to districts approved by landowner vote. (See former § 53325.3, added by Stats. 1982, ch. 1439, § 1, p. 5491 [authorizing landowner votes in certain circumstances], and

---

[14] Pursuant to Evidence Code sections 452, subdivision (c) and 459, subdivision (c), we take judicial notice of the legislative history on our own motion, having previously notified the parties of our intent to do so.

repealed by Stats. 1984, ch. 269, § 1, p. 1408.)  Nothing in the statute suggests that districts may be formed only where police protection and fire protection services were previously completely absent, or that the services to be funded by the tax must be superior to services in areas not subject to the tax.

In 1984, as part of legislation enacted to "clarify and streamline" the Mello-Roos Act, the Legislature expanded the range of additional services that could be funded by a Mello-Roos tax, and eliminated the requirement that funded facilities be "additional." (Stats. 1984, ch. 269, § 44, p. 1427; Former § 53313, added by Stats. 1984, ch. 269, § 2, pp. 1408-1409.)  A new section was added to the Act that addressed the use of Mello-Roos taxes for facilities, covering "the purchase, construction, expansion, or rehabilitation of any real or other tangible property . . . which is necessary to meet increased demands placed upon local agencies as the result of development or rehabilitation occurring within the district."  (Former § 53313.5, added by Stats. 1984, ch. 269, § 2.3, p. 1409.)  The new version of the Act retained the requirements that services be "in addition to those provided in the territory of the district before the district was created, and . . . not supplant those services already available within that territory," but did not impose those requirements on facilities.  (See Former §§ 53313, 53313.5, added by Stats. 1984, ch. 269, §§ 2.1, 2.3, pp. 1408-1409.)  This appears to reflect recognition that existing facilities eventually need to be replaced.[15]

The Mello-Roos Act was further amended in 1986 to clarify that a community facilities district *finances* (rather than provides) facilities and services.  (See Assem. Local Government Com., Rep. on 3d reading of Sen. Bill No. 1115 (1985-1986 Reg. Sess.) as amended Aug. 14, 1986, p. 2.)  As part of these amendments, the Legislature clarified the section 53313 requirements for additional services by placing them in two

---

[15] "I believe these changes [in the Act] will give local governments a more sophisticated and useful financing mechanism to finance construction and *rebuilding* of their capital facilities."  (Governor's Chaptered Bill File, ch. 269, Sen. Henry J. Mello, letter to Governor George Deukmejian (June 26, 1984) p. 2, emphasis added.)

separate sentences, rather than a single compound sentence.[16]  Instead of requiring that a *district provide* authorized services in addition to those provided and that a *district not supplant* services already available, the amended provision stated that a *district* could only *finance* the authorized services if they were in addition to those provided, and that the *services* (as opposed to the district) must *not supplant* already available services. (Former § 53313, amended by Stats. 1986, ch. 1102, § 3, p. 3847.)

In 1988, section 53313 was amended again so that the requirement that services be "additional" was limited to services financed by *landowner*-approved taxes.  (Former § 53313, amended by Stats. 1988, ch. 1365, § 4, pp. 4564-4565; see also Legis. Counsel's Dig., Sen. Bill No. 2254, 4 Stats. 1988 (1987-1988 Reg. Sess.) Summary Dig., p. 467.) This is the state of the law today.  (§ 53313.)  Previously a Mello-Roos district could finance the authorized services only if those services were "beyond the amount of such services already provided in the area."  (See Office of Local Government Affairs, Enrolled Bill Rep. on Sen. Bill No. 2254 (1987-1988 Reg. Sess.) Sept. 22, 1988, p. 1.) With the amendment, thus the range of services that could be financed by voter-approved districts was expanded to include already-existing services as well as additional services, while the range of services that could be financed by landowner-approved districts remained limited to "additional services," which, as we have discussed, includes services that meet an increased demand for existing services.  (§ 53313.)

These changes in section 53313 show that over time, the Legislature has expanded the range of services and facilities that can be funded by Mello-Roos districts.  From the

---

[16] Compare the earlier version of the statute ("A community facilities district may only provide the services authorized in this section to the extent that they are in addition to those provided in the territory of the district before the district was created, and may not supplant those services already available within that territory" (former § 53313, added by Stats. 1984, ch. 269, § 2, p. 1409) with the amended version ("A community facilities district may only finance the services authorized in this section to the extent that they are in addition to those provided in the territory of the district before the district was created.  The additional services may not supplant services already available within that territory when the district was created").  (Former § 53313, amended by Stats. 1986, ch. 1102, § 3, p. 3847.)

15

beginning, however, Mello-Roos taxes approved by landowner votes could be used to fund an increased demand for existing services.

### b.    *The Association's Arguments Are Not Persuasive*

The Association interprets the requirement of additional services (i.e., that services must be in addition to those provided in the territory of the district before the district was created) "as pertaining to the *quality* of service," and the prohibition against supplanting services (i.e., the requirement that additional services not supplant services already available within that territory when the district was created) as pertaining to "the *type* of service."  "In other words," according to the Association, "a landowner-approved tax may finance services that supplement existing services, but only if the new services provide homeowner-taxpayers a real and meaningful benefit that is over and above what non-district property owners receive as part of a standard menu of municipal services." We disagree.

### i.    *The Language of Section 53313*

The Association's interpretation is not supported by the language of the statute. First, the Association inserts language into section 53313, which does not distinguish the "type" and "quality" of additional services:  the statute states only that landowner-approved taxes may finance services only "to the extent that they are in addition to" existing services.  (§ 53313.)  Second, the Association introduces a comparison between services provided inside and outside the district that is absent from the statutory language. Third, the Association disregards the statutory language requiring the comparison of services funded by the tax with services provided in the district's territory before the district was created, as well as the statutory language that requires the comparison of services funded by the tax with services already available in the district's territory when the district was created.  (§ 53313.)

The Association contends that unless we adopt its interpretation, there is surplusage in section 53313 because "every service that is not in addition to one already available must necessarily be a supplanting service."  We see no surplusage in section 53313.  The statute requires that a landowner-approved tax may only be used to finance

16

additional services, that is, services that are in addition to the services provided in the territory before the district was created. For example, police protection services funded by the tax must be in addition to whatever police services were provided in the district before the district's creation. (See § 53313, subd. (a).) The statute also requires that the additional services not take the place of services that were available when the district was created. To continue with our example, the police protection services that were available when the district was created cannot simply disappear. The two requirements complement one another. The first mandates that the level of services financed by a landowner-approved tax must be in addition to those already provided; the second mandates that those financed services supplement, and not supplant, the services available when the district was created.

ii.      *The Structure of the Mello-Roos Act*

The Association argues that the tax here "cannot be reconciled with the Mello-Roos Act's structure," suggesting that the Act "reveal[s] a legislative concern that taxpayers should not have to pay more than similarly situated citizens without getting anything extra in return." But the Association does not point to any legislative statement of this concern, nor does the Association explain what would make citizens "similarly situated," nor what baseline should be used to determine what is "extra."

The Association claims that the purported legislative concern is reflected in the fact that the restrictions of section 53313 apply to services and not facilities, and to taxes approved by landowners as opposed to registered voters. The Association states that there is no need for special restrictions on the financing of facilities, contending that "[u]ndeveloped areas that would be part of a Mello-Roos district are unlikely to have any capital facilities nearby," and concluding that "the homeowners paying the facilities tax will actually get a higher or better level of capital improvement," all without any evidentiary support.

The Association also claims that the restrictions on taxes approved by landowner vote are "protections" that "help prevent local government abuse," by forcing elected officials to place tax measures on the ballot and campaign in support of the taxes to

17

residents who may vote them out of office. There can be no dispute that the Mello-Roos Act imposes limits on the services funded by landowner-approved taxes. But the Association offers no authority to support its claim about the purpose of those limits. The Association assumed incorrectly that the Legislature "added limitations" to section 53313 for landowner-approved taxes that finance services and not for voter-approved taxes. Rather, as we discussed above in connection with the legislative history (and as the Association conceded at oral argument), these limitations originally applied to all Mello-Roos taxes, for services and facilities. (Former § 53313, added by Stats. 1982, ch. 1439, § 1, p. 5487, and repealed by Stats. 1984, ch. 269, § 1, p. 1408.) The limitations were first removed from taxes for facilities, (see Former § 53313, added by Stats. 1984, ch. 269, § 2.1, pp. 1408-1409 and Former § 53313.5, added by Stats. 1984, ch. 269, § 2.3, p. 1409) and then from registered-voter approved taxes for services. (Former § 53313, amended by Stats1988, ch. 1365, § 4, pp. 4564-4565.)

In discussing the structure of the Mello-Roos Act, the Association implies that Mello-Roos taxes approved by landowner vote are improper under California law. This suggestion rests entirely on the Association's citation to *City of San Diego v. Shapiro* (2014) 228 Cal.App.4th 756, a case that did not even address the propriety of landowner votes under the Mello-Roos Act. *Shapiro* concerned the validity of a city tax that was approved in a landowner election conducted under a city ordinance that incorporated and modified certain procedures from the Mello-Roos Act pertaining to landowner elections. (*Id.* at p. 762.) The Court of Appeal concluded that the election was invalid under the California Constitution and the city's charter, (*id.* at p. 761) and emphasized that its opinion did not address the validity of landowner votes under the Mello-Roos Act. (*Id.* at pp. 786, fn. 32 & 792, fn. 42.)

### iii. *The County Service Area Law*

The Association argues we should interpret section 53313 "consistent with" a purportedly similar term in County Service Area Law (§ 25210 et seq.), which the

association argues is "in pari materia" with the Mello-Roos Act.[17] The Association claims that the County Service Area Law and the Mello-Roos Act are in pari materia because they provide for the creation of particular districts (the Mello-Roos Act) or service areas (the County Service Area Law) and for the financing of services through the levying of special taxes on property in such districts or service areas. When the Mello-Roos Act was passed, the version of the County Service Area Law then in effect authorized the establishment of service areas that would receive and pay for "types of extended service." (Former § 25210.4, added by Stats. 1953, ch. 858, § 1, p. 2190, repealed and replaced by Stats 2008, ch. 158, § 2, p. 487 & § 3, p. 505.) The Association argues that "additional services" in the Mello-Roos Act, which "shall not supplant services already available within that territory when the district was created" (§ 53313) should be understood like the term "extended service[s]" in the former version of the County Service Area Law. (Former § 25210.4, added by Stats. 1953, ch. 858, § 1, p. 2190, repealed and replaced by Stats. 2008, ch. 158, § 2, p. 487 & § 3, p. 505.)

This argument is not persuasive. The County Service Area Law and the Mello-Roos Act are not in pari materia. They are located in different portions of the Government Code. The County Service Area Law is in Title 3, Government of Counties; the Mello-Roos Act is in Title 5, Local Agencies. They pertain to different entities. The County Service Area Law pertains specifically to counties, while the Mello-Roos Act pertains to a wide range of entities, including cities, counties, school districts, joint powers entities, and redevelopment entities. (§ 53317, subd. (h).) And they serve

---

[17] "Two ' "[s]tatutes are considered to be in pari materia when they relate to the same person or thing, or to the same class of person[s or] things, or have the same purpose or object." ' (*Walker v. Superior Court* (1988) 47 Cal.3d 112, 124, fn. 4, quoting 2A Sutherland, Statutory Construction (Sands, 4th ed. 1984) § 51.03, p. 467; see also *Altaville Drug Store v. Employment Development Department* (1988) 44 Cal.3d 231, 236, fn. 4 [in pari materia means ' "[o]f the same matter" ' or ' "on the same subject," ' quoting Black's Law Dict. (5th ed. 1981) p. 1004.)" (*Lexin v. Superior Court* (2010) 47 Cal.4th 1050, 1091.) "It is a basic canon of statutory construction that statutes in pari materia should be construed together so that all parts of the statutory scheme are given effect." (*Id.* at pp. 1090-1091.)

different ends.  The County Service Area Law, enacted in the early 1950's, "was a legislative response to increasing inequities between residents of incorporated and unincorporated areas respecting the rendition and receipt of various municipal type services.  [Citation.]  As an alternative to other methods of obtaining correlation between cost burdens and service benefits, such as annexation, incorporation or the creation of special districts, provision was made for county service areas.  And, while not requiring unincorporated territories to otherwise change their status, provision was also made whereby a consistent state policy against subsidization of one group of taxpayers by another might be satisfied."  (*City of Santa Barbara v. County of Santa Barbara* (1979) 94 Cal.App.3d 277, 287 (*Santa Barbara*).)  The inequities addressed by the County Service Area Law resulted from unprecedented growth in the unincorporated areas of California counties since 1940.  (Former § 25210.1, added by Stats. 1953, ch. 858, § 1, p. 2189, repealed and replaced by Stats. 2008, ch. 158, § 2, p. 485 & § 3, p. 505.)  The Mello-Roos Act, in contrast, was not a response to inequities, but rather a response to the impaired ability of local governments to raise money after the passage of Proposition 13 in 1978.  (*Monterey Park*, *supra*, 211 Cal.App.3d at p. 376.)

Even if the two statutes were in pari materia, there is no definitive explication of the term "extended services" as it was used in the former County Service Area Law.[18]  In *Santa Barbara*, *supra*, 94 Cal.App.3d 277, on which the Association relies, the Court of Appeal considered the definitions of "extended services" and " 'extended police protection' " proposed by the two parties, a city and a county, in the context of the county's denial of the city's request to establish a county service area to provide sheriff's

---

[18] The former statute provided that the types of "extended service" for which a service area may be established are:  "(a) Extended police protection.  [¶] (b) Structural fire protection.  [¶] (c) Local park, recreation or parkway facilities and services.  [¶] (d) Any other governmental services, hereinafter referred to as miscellaneous extended services, which the county is authorized by law to perform and which the county does not also perform on a countywide basis both within and without cities, . . . ."  (Former § 25210.4, added by Stats. 1953, ch. 858, § 1, p. 2190, repealed and replaced by Stats 2008, ch. 158, § 2, p. 487 & § 3, p. 505.)

20

patrol services. (*Id.* at pp. 280, 283-284.) The County Service Area Law did not define either term, and the terms had not previously been defined by the courts. (*Id.* at p. 283.) The county maintained that " 'extended police protection' " meant "that which is in excess of the level of service normally rendered"; the city maintained that "extended services" included " 'extended police protection' " and meant "any service not being provided to the same extent on a countywide basis both within and without cities." (*Id.* at p. 284.) The Court of Appeal concluded that there was "no inherent incompatibility" between the proposed definitions, and stated that proper application of the statute would "depend upon a considered evaluation of the circumstances of any given case, to the end that fairness may be achieved among taxpayers within the perimeters of the factual setting associated with such circumstances." (*Id.* at p. 286.) The Court of Appeal not only declined to adopt a definition of "extended services," but it also made clear that the phrase was to be interpreted in connection with the statutory purpose. (*Ibid.*) As we have explained, the Mello-Roos Act and the County Service Area Law serve different purposes.

Furthermore, the County Service Area Law was completely revised in 2008 (Stats. 2008, ch. 158, § 2), eliminating the terms "extended service" and "miscellaneous extended services," which had engendered "past confusion and controversy." (Sen. Local Government Com. (2008) Serving the Public Interest: A Legislative History of SB 1458 and the "County Service Area Law", p. 50 <http://sgf.senate.ca.gov/sites/sgf.senate.ca.gov/files/STPIPublication.pdf> [as of Oct 13, 2016].) In these circumstances, we decline to interpret the Mello-Roos Act in light of the former County Service Area Law.

c. *Conclusion*

We conclude that the tax here was imposed in compliance with section 53313, which allows landowner-approved district taxes to fund services that meet increased demand in the district for existing services. We decline to adopt the Association's interpretation of section 53313, which would prohibit the tax at issue in this matter. The Association's interpretation requires a strained reading of the statute; fails to reflect the

21

intent of the Mello-Roos Act to finance services in developing areas (§ 53311.5) and "to ameliorate local revenue shortages created by the passage of Proposition 13" (*Monterey Park*, *supra*, 211 Cal.App.3d at p. 378); and ignores the statutory requirement that landowner-approved taxes fund services and facilities that are necessary to meet increased demand in the district where the tax is imposed. (§ 53326, subd. (b).) Because we conclude that the tax was imposed in compliance with section 53313, we turn to the other issues raised by the Association.

B.      *The Tax Is a Special Tax under the California Constitution*

The Association argues that the tax is an impermissible general tax because it will finance a wide range of services and facilities and its purpose is to raise revenue to supplement the City's general fund. Although the Association does not contend that the tax revenues anticipated here can literally be used for any and all governmental purposes, it argues that because tax revenues can be used for "a widely disparate menu of services and facilities," the tax is in effect a general tax. The Association concludes that the tax is therefore improper because the district is a "special purpose district" under Proposition 218, and as such has no power to levy general taxes. (Cal. Const., art. XIII C, § 2, subd. (a).)

The City argues that because the tax was levied under the Mello-Roos Act, it is by definition a special tax, since the Act states that "[a] tax imposed pursuant to this chapter is a special tax." (§ 53325.3.) The City also argues that the tax is a special tax under article XIII C, section 1, subdivision (d), of the California Constitution because it is imposed for specific purposes.

The undisputed facts before the trial court were that tax revenues are to be placed in a special fund, distinct from the City's general fund, and that revenue from the tax will not be available for all governmental purposes, but only for the purposes specified in the Resolution of Formation, which are included in the services listed in section 53313 of the Act.

22

1.    *Applicable Law*

In 1996, the voters approved Proposition 218, which added articles XIII C and XIII D to the California Constitution. (*Bay Area Cellular Telephone Co. v. City of Union City* (2008) 162 Cal.App.4th 686, 692 (*Bay Area Cellular*).)[19]

The relevant constitutional provision for our purposes is the distinction made in article XIII C between a "general tax," defined as "any tax imposed for general governmental purposes" and a "special tax," defined as "any tax imposed for specific purposes, including a tax imposed for specific purposes, which is placed into a general fund." (Cal. Const., art. XIII C, § 1, subds. (a) & (d).)  A general tax requires approval by a majority of the electorate.  (Cal. Const., art. XIII C, § 2, subd. (b).)  A special tax requires approval by two-thirds of the electorate.  (Cal. Const., art. XIII C, § 2, subd. (d).)  Under Proposition 218, all taxes imposed by local governments are either general or special taxes (Cal. Const., art. XIII C, § 2, subd. (a)), and a "special purpose district" has no power to levy general taxes.[20]  (Cal. Const., art. XIII C § 2, subd. (a).)  The Association argues that the district here is a "special purpose district," and the City does not dispute this.  We will assume, without deciding, that the district at issue here is a

---

[19] "The proposition, entitled the 'Right to Vote on Taxes Act,' included this statement of purpose:  ' " 'The people of the State of California hereby find and declare that Proposition 13 was intended to provide effective tax relief and to require voter approval of tax increases.  However, local governments have subjected taxpayers to excessive tax, assessment, fee and charge increases that not only frustrate the purposes of voter approval for tax increases, but also threaten the economic security of all Californians and the California economy itself.  This measure protects taxpayers by limiting the methods by which local governments exact revenue from taxpayers without their consent.' [Citations.]" [Citations.]' " (*Bay Area Cellular, supra,* 162 Cal.App.4th at pp. 692-693.)

[20] Proposition 218 does not define "special purpose district," but defines "special district" as "an agency of the State, formed pursuant to general law or a special act, for the local performance of governmental or proprietary functions with limited geographic boundaries including, but not limited to, school districts and redevelopment agencies." (Cal. Const., art. XIII C, § 1, subd. (c); see *Pajaro Valley Water Management Agency v. Amrhein* (2007) 150 Cal.App.4th 1364, 1378, fn. 10 [noting this discrepancy].)

23

"special purpose district" under Proposition 218, and therefore is prohibited from levying general taxes.

Courts have analyzed Proposition 218's distinction between special and general taxes and concluded that, "[t]he essence of a special tax 'is that its proceeds are earmarked or dedicated in some manner to a specific project or projects.' (*Neecke v. City of Mill Valley* (1995) 39 Cal.App.4th 946, 956[.])" (*Bay Area Cellular*, *supra*, 162 Cal.App.4th at p. 696.) "[A] tax is special whenever expenditure of its revenues is limited to specific purposes; this is true even though there may be multiple specific purposes for which revenues may be spent. (*Monterey Peninsula Taxpayers Assn. v. County of Monterey* (1992) 8 Cal.App.4th 1520, 1535.) A tax is general only when its revenues are placed into the general fund and are available for expenditure for any and all governmental purposes. (*Ibid.*)" (*Howard Jarvis Taxpayers Assn. v. City of Roseville* (2003) 106 Cal.App.4th 1178, 1185 (*City of Roseville*).)

2.  *Analysis*

To determine whether the tax is a special tax, we begin with the Mello-Roos Act itself. By its terms, the Act provides that any tax imposed pursuant to its authority is a special tax. (§ 53325.3.) And the Act contemplates that a Mello-Roos tax may be used for multiple purposes without changing its character. For example, section 53313 states that a Mello-Roos district may finance "*any one or more* of the following types of services" (emphasis added), and follows that phrase with seven subdivisions, listing seven separate categories of services, which are themselves quite broad. (See, e.g., § 53313, subd. (a) ["[p]olice protection services, including but not limited to, criminal justice services"].[21]) Section 53313.5 provides that a Mello-Roos district may finance a range of "facilities" and work related to those facilities. The Act requires that a Resolution of Formation for a Mello-Roos district must "[i]dentify any facilities or services proposed to be funded with the special tax."] (§ 53325.1, subd. (a)(2).) The

_____

[21] "However, criminal justice services shall be limited to providing services for jails, detention facilities, and juvenile halls." (§ 53313, subd. (a).)

24

City, accordingly, proposed a "special tax" in its Resolution of Formation, and identified the specific types of facilities and services to be financed by the special tax, all of which are included in section 53313 of the Act. We recognize that a legislative body's designation of the nature of a tax, though entitled to weight, is not dispositive. (*Rider v. County of San Diego* (1991) 1 Cal.4th 1, 14-15.)

Proposition 218 and the cases interpreting it are further support for the designation of this tax as a special tax. Proposition 218 explicitly recognizes that a special tax may have multiple purposes, and puts no limits on number of purposes permitted. (Cal. Const., art. XIII C, § 1, subd. (d).) Thus, in *City of Roseville*, a city tax earmarked " 'for police, fire, parks and recreation or library services' " was held to be a special tax under Proposition 218. (*City of Roseville*, *supra*, 106 Cal.App.4th at p. 1186.) The case arose in the context of a ballot measure placed before voters by the city council (Measure Q) that proposed to incorporate a pre-existing utility tax into the city's charter while limiting the purposes for which tax revenue could be used. (*Ibid.*) After the measure was approved by a majority of the voters, it was challenged on the grounds that it was a special tax that required two-thirds approval. There was no dispute that the pre-existing utility tax, which was paid into the city's general fund for the unrestricted use of the city, was a general tax. (*Id.* at p. 1181.) The Court of Appeal had no difficulty in concluding that Measure Q "[o]n its face" proposed a special tax, because the revenues would be restricted to specific limited purposes. (*Id.* at p. 1186.) The city argued that the tax was a general tax because Measure Q did not provide a formula for allocating revenue among the various purposes. (*Id.* at p. 1187.) The Court of Appeal disagreed: "Nothing in Proposition 218 requires or suggests that, to be a special tax, a proposed tax must provide a detailed formula for allocations of revenues. To the contrary, a special tax is 'any tax imposed for specific purposes' even if revenues are placed into a general fund." (*Ibid.*, quoting Cal. Const., art. XIII C, § 1, subd. (d).) Nor was the Court of Appeal persuaded by the argument that more than half the city's general fund was allocated to the same purposes (police, fire, parks and recreation, and library services) and that revenue from the Measure Q tax would be sufficient to cover less than 25 percent of these expenditures.

25

(*Ibid.*) Measure Q still proposed a special tax under Proposition 218, and therefore required a two-thirds vote.

*Neilson v. City of California City* (2005) 133 Cal.App.4th 1296 (*Neilson*) provides further support for the proposition that a tax dedicated to a wide range of specific purposes is a special tax. In *Neilson*, voters approved a city-imposed parcel tax, characterized as a special tax, to be used " 'to pay for police, fire and recreational services, and to repair streets, parks, water line replacement and repair, and building maintenance.' " (*Id.* at p. 1302.) A taxpayer sued to invalidate the tax on several grounds, including that it was a general tax. (*Id.* at p. 1301.) The trial court sustained the city's demurrer without leave to amend. (*Ibid.*) In affirming, the Court of Appeal addressed plaintiff's contention that the tax was really a general tax, which relied on the argument "that there must be some limit on the specific purposes that can be stacked together before the line is crossed and the revenues are used for 'general governmental services.' " (*Id.* at p. 1311.) The Court of Appeal noted that the argument was unsupported by authority and contrary to the opinion in *City of Roseville* and to the language of Proposition 218, which uses the plural " 'specific purposes' " in defining a special tax. (*Neilson* at p. 1311.)

The Association's argument here that the tax is designated for so many disparate purposes that it amounts to a general tax relies entirely on a statement by the court in *Neilson* that it could "conceive of a special tax that permits expenditures for so many specific governmental purposes that the parts might swallow the whole." (*Neilson*, *supra*, 133 Cal.App.4th at p. 1311.) The *Neilson* court never reached the issue because the taxpayer neither "pled sufficient facts to show that the parcel tax [there] is such a tax," nor "suggest[ed] how he might cure his defect." (*Ibid.*) *Neilson* does not purport to define the outer bounds of a special tax, and the Association is therefore incorrect to claim that the tax here "run[s] afoul" of a standard set in *Neilson*. In light of the specific enumerated services for which tax revenue may be used in this case, we cannot say on this record that the tax is a general tax.

We disagree with the Association's argument that because the tax is intended to "supplement" the City's general fund expenditures it tax is a general tax. If the Association were correct, there could be no special taxes, because any special revenue will necessarily "supplement" the City's general fund expenditures. In any event, the argument is supported solely by glancing citations to *Weisblat v. City of San Diego* (2009) 176 Cal.App.4th 1022, 1045 (*Weisblat*), which held that a purported "fee" imposed by a city without a vote of the electorate was actually a general tax.

*Weisblat* concerned a "processing fee" levied by the City of San Diego on taxpayers who were subject to a rental users business tax, which was part of the city's business tax. (*Weisblat*, *supra*, 176 Cal.App.4th at pp. 1028-1029.) The fee was challenged by taxpayers, who claimed it was a tax that required a vote of the electorate. (*Id.* at p. 1031.) The Court of Appeal agreed. (*Id.* at p. 1044.) To determine whether the levy was a general tax or a special tax, the court looked to Proposition 218 and *City of Roseville*. (*Weisblat* at pp. 1044-1045.) The court "note[d] that the levy appears to be a hybrid tax," with characteristics of a general and special tax. (*Id.* at p. 1044.) Because the proceeds were to be deposited in the general fund, it appeared to be a general tax. (*Ibid.*) But instead of being available for any and all government purposes, as would be required for a general tax, the funds were to be tracked in special accounts and monitored to ensure that they did not exceed the cost of collecting and administering the business tax program.[22] (*Id.* at p. 1045.) The Court of Appeal concluded the levy was a general tax "[d]espite its dual, hybrid nature" because the tax "indirectly" raised revenue that would be available for any and all governmental purposes. (*Ibid.*) Before the levy was imposed, the costs of administering the business tax, which was a general tax, were taken from the business tax proceeds. (*Ibid.*) The imposition of the levy resulted in funds to pay for the administration of the business tax, which meant that in "practical effect the

---

[22] We presume this is why the "fee," which was originally $25, was reduced to $15 two years later. (*Weisblat*, *supra*, 176 Cal.App.4th at p. 1030.)

27

levy [was] an increase in the Business Tax and therefore an increase in a general tax" that required voter approval and could not be unilaterally imposed by the city. (*Ibid.*)

*Weisblat* is nothing like the matter before us. The tax here was never denominated a "fee": it was consistently identified as a special tax under the Mello-Roos Act, and its specific purposes were spelled out as we have described. Nor does the City's tax have a hybrid nature. It will not be deposited in the general fund, and its proceeds will not indirectly raise revenue that would be available for any and all governmental purposes. Tax revenue will not cover existing costs that were previously paid from the general fund: it will, instead, cover new costs resulting from the increased demand for facilities and additional services that will result from the Acre project.

We conclude that the tax is a special tax, not a general tax, for the purposes of article XIII C of the California Constitution.

C.     *The Ordinance Does Not Retaliate Against District Landowners*

1.     *The Effects of a Potential Repeal of the Tax*

The City ordinance imposing the tax incorporates the following provision, referring to the tax as the "Special Tax" and referring to the facilities and services authorized by the Resolution of Formation as the "Authorized Facilities and Authorized Services": "If the levy of the Special Tax is repealed by initiative or any other action participated in by the owners of parcels in [the district] . . . , the City shall cease to levy the Special Tax and shall cease to be obligated to provide the Authorized Facilities and Authorized Services for which the Special Tax was levied. The obligations to provide the Authorized Facilities and Authorized Services previously funded by the repealed Special Tax shall become the obligations of any property owners association established within [the district] . . . , and if there is no such association, they shall become the joint obligations of the property owners of Parcels within [the district] in proportion to the number of Parcels within [the district]." We follow the parties in referring to this provision as "Section H."

The Association argues that the ordinance is unconstitutional on its face because it incorporates Section H, which violates the due process rights of landowners within the

28

District "by threatening [them] with loss of municipal services and financial ruin" if they exercise their rights to challenge the legality of the City's actions. The Association maintains that it does not matter whether any property owner has yet suffered retaliation, claiming that "[i]t is enough that the ordinary [district] property owner will seek to avoid Section H's application by refraining to exercise his or her rights."

The City contends that "Section H simply addresses the contingency that the special tax may in the future be repealed by the property owners of the district through the initiative or any other process." The City also argues that for an ordinance to be unconstitutional on its face, it must be unconstitutional in all its applications, something that the Association has not shown, in part because the Association's argument relies on speculation about what might happen in future circumstances.

2.      *Applicable Law*

"A facial challenge to the constitutional validity of a statute or ordinance considers only the text of the measure itself, not its application to the particular circumstances of an individual. (*Dillon v. Municipal Court* (1971) 4 Cal.3d 860, 865.) ' "To support a determination of facial unconstitutionality, voiding the statute as a whole, petitioners cannot prevail by suggesting that in some future hypothetical situation constitutional problems may possibly arise as to the particular *application* of the statute . . . . Rather, petitioners must demonstrate that the act's provisions inevitably pose a present total and fatal conflict with applicable constitutional prohibitions." ' (*Arcadia Unified School Dist. v. State Dept. of Education* (1992) 2 Cal.4th 251, 256, quoting *Pacific Legal Foundation v. Brown* (1981) 29 Cal.3d 168, 180-181.)" (*Tobe v. City of Santa Ana* (1995) 9 Cal.4th 1069, 1084 (*Tobe*).)

Facial challenges to statutes and ordinances are disfavored. Because they often rest on speculation, they may lead to interpreting statutes prematurely, on the basis of a barebones record. (*Washington State Grange v. Washington State Republican Party* (2008) 552 U.S. 442, 450.) Also, facial challenges conflict with the fundamental principle of judicial restraint that courts should not decide questions of constitutional law

29

unless it is necessary to do so, nor should they formulate rules broader than required by the facts before them. (*Ibid.*)

Accordingly, we start from "the strong presumption that the ordinance is constitutionally valid." (*Allen v. City of Sacramento* (2015) 234 Cal.App.4th 41, 54 (*Allen*), citing *Tobe, supra*, 9 Cal.4th at p. 1084 and *City of San Diego v. Boggess* (2013) 216 Cal.App.4th 1494, 1503 (*City of San Diego*).) "We resolve all doubts in favor of the validity of the ordinance. (*City of San Diego, supra*, 216 Cal.App.4th at p. 1503.) Unless conflict with a provision of the state or federal Constitution is clear and unmistakable we must uphold the ordinance. (*Ibid.*; *Samples v. Brown*[ (2007)] 146 Cal.App.4th [787,] 799.) Plaintiffs bear the burden of demonstrating that the ordinance is unconstitutional in all or most cases. (*City of San Diego, supra,* 216 Cal.App.4th at p. 1054.)" (*Allen, supra*, 234 Cal.App.4th at p. 54.)

3.  *Analysis*

Section H states that if the tax is repealed by initiative or other action of the district taxpayers, the City will stop levying the tax, will no longer be required to provide the services and facilities funded by the tax, and any obligations undertaken to provide the services and facilities will become the obligations of the district property owners' association or the district property owners themselves. It is undisputed that even if the tax is repealed, and the City ceases to provide the additional services authorized in the resolution forming the district, the City would still provide the district with "standard municipal services," defined as "police, park, recreational, open space, landscaping, street and street lighting, flood and storm protection, and stormwater treatment facilities."[23]

A claim of retaliation in violation of due process requires plaintiff to show "that (1) he or she was engaged in constitutionally protected activity, (2) the defendant's

---

[23] The City's Administrative Services Director testified at her deposition that the City would still provide standard municipal services even if the tax were repealed. She did not know whether those services would be provided at the same level as if the tax were still in place. Nothing in section H or elsewhere in the record suggests that if the tax is repealed the City would, or could, stop providing services funded from other sources.

retaliatory action caused the plaintiff to suffer an injury that would likely deter a person of ordinary firmness from engaging in that protected activity, and (3) the retaliatory action was motivated, at least in part, by the plaintiff's protected activity." (*Tichinin v. City of Morgan Hill* (2009) 177 Cal.App.4th 1049, 1062-1063 (*Tichinin*).)

The Association cites no authorities suggesting that a claim of retaliation is appropriate in a situation like the one here. That is no surprise, because the law of retaliation has little application to the outcome of a potential lawsuit in which a court might determine that a tax is invalid, or the outcome of a hypothetical future election in which voters express their will to repeal a tax. It is not a violation of due process to recognize that if a tax has been imposed to provide additional services and facilities to a district, and if that tax is repealed and not collected, there will no longer be funds to provide the district with those additional services and facilities, and any obligations that have been incurred to provide those services and facilities will need to be met from other sources.

There is no retaliation here. There is no injury, penalty or adverse action to property owners for exercising their rights. There will doubtless be consequences if district property owners exercise their rights and that exercise results in the repeal of the tax. Those consequences may be regarded as "adverse" by some, but they may well be precisely the consequences that are expected and desired by the property owners who take the actions. Section H explains the consequences of a repeal of the tax. The consequences are not triggered by the filing of petitions, initiative proceedings, or lawsuits. Rather, the consequences flow from the absence of the tax revenue that was to be collected to pay for services and facilities.

The Association's argument that Section H retaliates against property owners who exercise their rights is strained, and the cases on which the Association relies are inapposite. The Association's primary authorities, *Mt. Healthy City School Dist. Board of Education v. Doyle* (1977) 429 U.S. 274; *Tichinin, supra*, 177 Cal.App.4th 1049; and *Franklin v. Leland Stanford Junior University* (1985) 172 Cal.App.3d 322, concern universities or public entities which took concrete adverse action against individuals who

31

exercised their constitutional rights. Here, however, there is no evidence that the exercise of constitutional or statutory rights would itself cause adverse action.

The other authorities that the Association cites do not help its case either. For the uncontroversial proposition that it is a violation of due process to punish a person because he has done what the law permits him to do, the Association cites *United States v. Goodwin* (1982) 457 U.S. 368, 372, which arose from a prosecutor's decision to add a felony charge to pending misdemeanor charges when a defendant who had initially expressed an interest in a plea agreement later decided that he wanted a trial by jury. (*Id.* at p. 382.) Section H does not seek to deny district property owners their initiative or referendum powers, which were at issue in *Rubalcava v. Martinez* (2007) 158 Cal.App.4th 563, 571, cited for the proposition that cities cannot deny citizens the powers reserved to citizens in the California Constitution. Nor does Section H run afoul of the fundamental principle that the right to petition "includes the basic act of filing litigation." (*Briggs v. Eden Council for Hope & Opportunity* (1999) 19 Cal.4th 1106, 1115.) And Section H does not threaten district property owners with criminal prosecution, which was at issue in *Dombrowski v. Pfister* (1965) 380 U.S. 479, where appellants successfully sought declaratory relief and an injunction to restrain prosecution under the Louisiana Subversive Activities and Communist Control Law and the Communist Propaganda Control Law. (*Id.* at pp. 482, 497.)

We conclude that the ordinance does not retaliate against district property owners for exercising their rights.

### DISPOSITION

The judgment is affirmed. The City shall recover its costs on appeal.

 

                         _____

                         Miller, J.

We concur:

_____

Richman, Acting P.J.

_____

Stewart, J.

A145575, *Building Industry Association – Bay Area v. City of San Ramon, et al.*

Trial Court:  Superior Court of Contra Costa County

Trial Judge:  Hon. Jill Fannin

| | |
|---|---|
| Attorneys for Appellant<br>Building Industry Association | Paul B. Campos<br>Damien M. Schiff |
| Attorneys for Respondent<br>City of San Ramon, et al. | Allan Robert Saxe<br>Interim City Attorney<br>Alicia Poon<br>Deputy City Attorney |
| Attorneys for Amicus Curiae<br>League of California Cities<br>in support of Respondents | Michael G. Colantuono<br>Leonard P. Aslanian |

A145575, *Building Industry Association – Bay Area v. City of San Ramon, et al.*